**In re CENTURY INVESTMENT FUND VII LIMITED PARTNERSHIP.**

**Bankruptcy No. 88–03061.**

United States Bankruptcy Court,
E.D. Wisconsin.

Feb. 2, 1989.

Albert Solochek and Andrew N. Herbach, Howard, Peterman, Solochek & Nashban, S.C., Milwaukee, Wis., for O & G.

Malcom Gaynor, Robert D. Nachman, Richard M. Bendix, Jr., Schwartz, Cooper, Kolb & Gaynor Chartered, Chicago, Ill., David V. Jennings III, Godfrey, Trump & Hayes, (local counsel), Milwaukee, Wis., for debtor.

## DECISION

M. DEE McGARITY, Bankruptcy Judge.

## PROCEDURE

This case came before the court upon the motion of J. Marshall Osborn and Arthur G. Grandlich ("O & G"), holders of a second mortgage on the real estate known as Valley View Apartments, for relief from the automatic stay or for adequate protection and for dismissal of the case for bad faith filing. At the final hearing, O & G withdrew the motion to dismiss and modified their motion to request that the court modify the stay to allow them to proceed with their foreclosure but to terminate the stay only upon further request of O & G. Minnesota Mutual Life Insurance Company, one of three holders of first mortgages on the property, supported O & G's motions. Other first mortgagees did not appear. The debtor objected to the relief requested.

The debtor moved that its exclusive period for filing a plan of reorganization be extended. 11 U.S.C. § 1121(d). The original exclusive period expired on November 10, 1988. This motion is opposed by O & G because they wish to file a competing plan. Finally, the debtor filed a motion to employ Century Management Group, Ltd. as the property management firm to manage the apartment complex, although the debtor has also argued that no approval is necessary because a property manager is not a "professional person" requiring court approval under 11 U.S.C. § 327. O & G and Minnesota Mutual objected to the appointment. Since the evidence expected to be submitted by each side was relevant to all pending motions, a decision was deferred until all evidence could be presented. An order relating to the use of rents and adequate protection of the first mortgagees was entered pending the outcome of these motions. The preliminary hearing was held on November 2, 1988, and evidentiary hearings were held on November 10, November 29, and December 13, 1988. The following persons testified:

1. John Helling, president of Century Management Group, Ltd.

2. Wayne Chaney, general partner of Century Capital Group, a general partnership that is general partner of the debtor.

3. Lawrence Golicz, appraiser hired by O & G.

4. Patrick Behm, director of Capital Mortgage and Investment Corpora-

tion, owned by Osborn and Behm, and the selling broker of Valley View in 1984.

5. Bob Bauer, former manager of Valley View.

6. Linda Biddick, present manager of Valley View.

After being thoroughly advised of the matter, the court makes the following determinations:

1. O & G are entitled to relief from the automatic stay. Their motion to modify the stay to permit continuation of their foreclosure on the real estate is granted, and the stay will be lifted with respect to the real estate upon O & G's request without further notice. .

2. Debtor's motion to extend its exclusive period for filing a plan is denied.

3. Debtor's motion to appoint Century Management Group, Ltd. as its property management firm is not necessary and, accordingly, is denied.

### FACTS

Century Investment Fund VII Limited Partnership was formed in 1984 for the purpose of acquiring Valley View Apartments, a 336 unit apartment complex in Fitchburg, Wisconsin, a suburb of Madison. Six 50 unit buildings were built in 1972, and two smaller buildings were built in 1974 and 1980. The purchase price was $9,300,000. The complex consists of eight buildings with a total of 48 efficiencies, 194 one bedroom units and 94 two bedroom units. Rents range from $335 to $350 for efficiencies, $370 to $395 for one bedroom apartments and $455 to $475 for two bedroom apartments. There are tennis courts and an in-ground, outdoor swimming pool.

The sole general partner of the debtor is Century Capital Group, a general partnership originally consisting of Wayne C. Chaney and J. Peter Jungbacker as general partners. In 1987, Century Capital Group, Ltd., a corporation, was formed and became another general partner of Century Capital Group. Jungbacker and Chaney each own 50% of the stock of Century

Capital Group, Ltd. There are numerous limited partners.

Century Capital Group, Ltd. has three wholly owned subsidiaries. These include Century Capital Group Securities, Ltd., Century Capital Group Development, Ltd. and Century Management Group, Ltd. ("CMG"). CMG has been managing Valley View and other real estate projects of which Century Capital Group, Ltd. or Century Capital Group is a general partner and continues to do so pending a determination of CMG's status as a professional person and approval of appointment, if necessary. Chaney and Jungbacker are unpaid officers and directors of CMG. CMG has a third director, John Helling, who is also its president.

The parties stipulated that as of November 10, 1988, the following liens encumbered the property:

| Minnesota Mutual | $4,616.782 |
| First Financial | 309,024 |
| Lutheran Mutual | 223,112 |
| Osborn & Grandlich | 2,698,370 |
| | $7,847,288 |

The first three creditors listed have separate first mortgages on three parcels comprising the apartment complex. O & G have a second mortgage on all three parcels. In addition, there were unpaid real estate taxes of approximately $122,000, as of the filing of the Chapter 11 on July 13, 1988, for years prior to 1988.

An appraisal prepared by Lawrence Golicz for O & G states that the fair market value of the property is $8,000,000 and the liquidation value is $6,400,000. However, the parties agreed that for the purposes of this hearing the value of the property as of the date the motion was filed on October 11, 1988, is equal to the total amount of the liens; that is, O & G is neither over- nor undersecured. They are fully secured. Conversely, the debtor has no equity in the property. This valuation is not binding for any purpose other than this motion.

Additional facts will be set forth in the appropriate parts of this decision.

## AUTOMATIC STAY

O & G moved to have the automatic stay, imposed under 11 U.S.C. § 362(a), modified to allow it to foreclose on Valley View Apartments. They further requested that the stay be lifted without further notice upon subsequent request by O & G. The practical effect of such relief would be to allow O & G to continue the foreclosure but to maintain the jurisdiction of the bankruptcy court to allow O & G to submit a competing plan.

■ Under 11 U.S.C. § 362(d), the court shall grant relief from the stay if there is cause, including lack of adequate protection. 11 U.S.C. § 362(d)(1). The parties have stipulated that the value of the property is equal to the amount of outstanding liens, making O & G fully secured but not oversecured. The property is insured, current taxes are being escrowed, and the property is being maintained. Its value appears to be stable at the present time (although the value may diminish without certain improvements). If a feasible plan were on the horizon and if the value can be maintained, it appears that O & G has no interest in the property that is diminishing in value. Consequently, they would not be entitled to current payments as adequate protection. *United Savings Association of Texas v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In other words, being fully secured is no better than being undersecured for the purpose of determining whether something more than maintaining the value of the property is necessary for adequate protection under *Timbers*. Interest payments are being made, however, to the first mortgagees to prevent their interests from increasing and encroaching upon the interest of the second mortgagee.

It appears that the debtor is able to maintain the property and to prevent any diminution in value in order to provide adequate protection of O & G's interest. Mr. Golicz, O & G's appraiser, did not testify to any substantial deferred maintenance that lowers the value of the property at the present time. Nevertheless, he felt that if certain improvements are not made promptly, the property's value could decline. This requires that expenditures for improvements be made in the immediate future, in addition to interest on the first mortgages, post-petition taxes, insurance and normal maintenance. These immediate improvements include:

1. *Hallway carpeting*. Until recently, all eight buildings had the original hallway carpet. Since filing, Mr. Helling testified that carpet in three hallways and three units was replaced for about $20,000. Ms. Biddick testified that she plans to recarpet two hallways and has received a bid of $16,000. This makes the cost of carpeting a hallway about $8,000. Given the age of the buildings, all but possibly the one built in 1980 should be recarpeted. Mr. Golicz testified to their decrepit condition, and his assessment is more credible than Ms. Biddick's, who appears to be, shall we say, overly charitable in her evaluation of the property. Since three have already been done, carpet for an additional four hallways would cost about $32,000.

2. *Unit carpeting*. The court was not convinced by Ms. Biddick's testimony that much of the original unit carpeting was serviceable (after 16 years?), nor that the carpet in the occupied units is as good as it is in the model apartment. Mr. Golicz felt that the original shag carpet which is still in about 80% of the units should be replaced. He said that much of it was dirty, smelled bad and was beyond cleaning. Three units have been recarpeted since the filing, and Mr. Helling testified that they usually recarpet about one unit per month, at a cost of $600 to $1,000. The average cost of replacing unit carpeting would then be about $800. It is easier to replace carpet when a tenant moves out, but a few would like to have it done while they are still there.

Nasty carpet is definitely an impediment to increased occupancy, and the court was left with the impression that this is an emergency. If there are now (as of November 10, 1988) 287 occupied units, then there are 49 vacancies. All of these (give or take a few that might have been recarpeted) should have new carpet. The com-

plex has substantial competition in the area, and new carpet is an important means of attracting new tenants to these apartments and away from others. The cost would be about $39,200, plus an additional $5,000 to $10,000 for present or renewing tenants who could be more easily persuaded to stay with new carpet. This would put the immediate unit carpet allocation at, say, $46,000.

3. *Insulation.* Mr. Golicz, who is a certified insulation inspector for the State of Wisconsin, testified that the buildings have four inches of blown insulation and need another eight to ten inches. The cost would be about $60,000. Although there is not a great deal of winter remaining, there could be benefit in doing so immediately. It should be done at least by next fall. This should not only enhance or prevent diminution in the value of the property, but heating costs would be reduced as well.

4. *Thermopanes.* Mr. Golicz, Mr. Behm and Mr. Bauer all reported seeing fogged windows caused by breaks in the seal between the panes of glass. This is not only unsightly, it reduces the effectiveness of having the air layer for insulation. Ms. Biddick felt this is not a problem. However, the court accepts Mr. Golicz' estimate of $15,000 (actually, he estimated a range of $10,000 to $20,000) to correct the situation.

5. *Miscellaneous.* Other cosmetic improvements mentioned by Messrs. Golicz, Behm and Bauer include patching the parking lot, replacing rotted window sills and landscaping. The court does not have a reliable price on these items (we are not willing to take Mr. Bauer's superficial estimate of $10,000 to $15,000 for the parking lot), but on the assumption that they would not be free, the court will estimate an additional $5,000 for such general sprucing up.

The total of these immediate repairs is around $158,000. The debtor had about $95,000 in reserve at the end of October. By saving the cost of its second mortgage, the debtor estimates (Exhibit 5) that it will have $156,734 by the end of May, 1989. If the insulation is not done until spring or summer, the debtor appears to be able to generate sufficient income to provide the minimum adequate protection for O & G required by *Timbers.* Accordingly, additional payments are not required for the debtor to maintain adequate protection for O & G.

Alert participants in these proceedings will undoubtedly have noticed the court's lack of reference to replacement of appliances and equipment. However, these items have not become critical yet and do not appear to be integral to the adequate protection issue. These could be replaced on an as needed basis.

■ Since adequate protection is possible, the court must next determine if there are other grounds to lift the stay. The stay may also be lifted if the debtor has no equity in the property, as is the case here, and if the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). The key statutory language in 11 U.S.C. § 362(d)(2) is that "the property is not necessary to an *effective* reorganization." (emphasis added) The debtor has the burden of proof as to this element. 11 U.S.C. § 362(g); *United Savings Association of Texas v. Timbers of Inwood Forest, supra,* at 632; *In re National Real Estate Limited Partnership II,* 87 B.R. 986, 989 (Bankr.E.D.Wis.1988); *In re Playa Development Corp.,* 68 B.R. 549, 553 (Bankr.W. D.Tex.1986). It is insufficient for the debtor to show merely that reorganization is impossible without the property. That much is obvious to all concerned. The debtor must also show that reorganization is feasible within a reasonable period of time. When effective reorganization is impossible, the purpose of Chapter 11 and the automatic stay cannot be fulfilled, and the stay must be lifted. *United Savings Association of Texas v. Timbers of Inwood Forest, supra,* 108 S.Ct. at 632–33; *In re National Real Estate Limited Partnership II, supra,* at 991–92; *In re Playa Development Corp., supra,* at 553–55; *In re 8th Street Village Limited Partnership,* 88 B.R. 853, 856–57 (Bankr.N.D.Ill. 1988); *In re Anderson Oaks (Phase I) Limited Partnership,* 77 B.R. 108, 110–11

(Bankr.W.D.Tex.1987); *In re Development, Inc.,* 36 B.R. 998, 1005 (Bankr.D. Haw.1984); *Matter of Anchorage Boat Sales, Inc.,* 4 B.R. 635, 641 (E.D.N.Y.1980); *In re Terra Mar Associates,* 3 B.R. 462, 466 (Bankr.D.Conn.1980). The debtor argues and other courts have used a pure "necessity" test rather than the "feasibility" adopted by this court, but we are persuaded that the latter is a more appropriate interpretation of the statute. *United Savings Association of Texas v. Timbers of Inwood Forest, supra,* 108 S.Ct. at 632–33; *see also, e.g., In re Baskerville,* 93 B.R. 251 (D.Colo.1988) (necessity test adopted).

■ For the purpose of determining whether a plan is feasible, let us assume that O & G's interest is impaired due to insufficient value to cover the full amount of their claim, including accruing interest, and they will not consent to any proposed plan of the debtor. Although it is not determinative of the outcome of the case, O & G will probably make an 11 U.S.C. § 1111(b) election to have its entire claim treated as secured. There is no apparent advantage in being an unsecured claimant, regardless of the form a plan might take. Also, there is minimal unsecured property, and if the real property appreciates in value with the election, O & G would have a chance of recovering interest accrued between November 11, 1988, and the date of confirmation.

An objecting secured claimant receiving deferred cash payments in a plan of reorganization is entitled to "at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). This has been interpreted to mean the total deferred payments must have a present value equal to the allowed secured claim. *In re 360 Inns, Ltd.,* 76 B.R. 573, 585–94 (Bankr.N.D.Tex. 1987); *In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503, 1505 (9th Cir.1987); *United States v. Neal Pharmacal,* 789 F.2d 1283, 1286; 5 *Collier on Bankruptcy* ¶ 1129.03(4)(f)(i) at 1129–60

to 66 (15th ed. 1988). The current market rate of interest is used to determine the present value, and this rate is determined by the court on a case-to-case basis. *Id.* Since all mortgages in this case are fully secured, they would have to receive a current market rate of interest on the full amount of their claims. In O & G's case, the secured amount would be at least the value as of November 10, 1988, the date of the hearing at which the stipulation was entered into.

Without so much as a rough outline of a proposed plan, the court is left to its own devices to determine the feasibility of the debtor's reorganization. The debtor did submit a projected cash flow for Valley View through the end of 1989 (Exhibit 5). Neither Mr. Helling nor Ms. Biddick, the persons most familiar with day to day operations, would wholeheartedly support the projection, especially the month by month breakdown, although both felt that the final numbers were possible. Mr. Helling testified that there were several projections made, and he was only asked if the numbers on the submitted projections looked reasonable. Occupancy is assumed to increase to 90% in March, remain stable through August, and increase to 95% by year end. This does not correspond with Ms. Biddick's testimony concerning seasonal rentals in Madison. Rents are increased in the projection, even though Ms. Biddick lowered rents and offered a month's free rent to increase occupancy in 1988. Mr. Helling felt that the occupancy problem in large part was caused by construction on Fish Hatchery Road, but the debtor projects high occupancy in spite of another phase of construction planned for 1989. These weaknesses aside and assuming for the moment the efficacy of the projected cash flow, the debtor still has serious feasibility problems. Such is the case even though at this stage of the proceeding (the hearing was begun during the debtor's exclusivity period) the court does not require a detailed account of the contemplated plan and can be more flexible in determining if the debtor has options available. *United Savings Association of Texas v. Timbers of Inwood Forest, supra,* 108 S.Ct. at 632–

33; *In re Planned Systems, Inc.*, 78 B.R. 852, 866 (Bankr.S.D. Ohio 1987).

There are three conceivable ways (possibly more, but none that were even intimated at the hearings) that the debtor could execute a successful reorganization. It could (1) continue operations and pay creditors pursuant to a plan, or (2) refinance to pay creditors and continue in possession, or (3) sell the property pursuant to a plan. To determine if the first option is viable, the cash flow projection must be analyzed. Mr. Chaney testified that by October, 1989, approximately one year and three months after filing (somewhat beyond the "reasonable period" defined by *Timbers*), the debtor would be able to generate enough cash to pay the second mortgagee interest only at the contract rate of 11%, but not at the default rate of 13%. He reached this conclusion because the interest on $2,698,370 at 11% is $24,735 per month, and by October, 1989, the excess cash generated after cost of operations would be $25,763. Payment of arrearages, principal or prepetition real estate taxes was not mentioned.

If the debtor begins payment of 11% interest to O & G beginning in October, 1989, this leaves the debtor excess cash of $1,028 that month. Most of the rest of its cash cushion is gone because of necessary improvements. We do not have projections beyond 1989, but since the projection assumes 95% occupancy, we cannot contemplate large increases in income without corresponding increases in expenses. Also, Mr. Golicz felt that the rents were already high compared with the competition, so large increases are unlikely. This was born out by the reduction in rent of one bedroom apartments necessary to increase occupancy to its current level.

Mr. Golicz noted that most of the appliances are original. They have already reached the end of their expected lives, and substantial replacement costs could begin at any time. A stove and refrigerator cost about $750 to replace. Since most of the appliances are green or gold, colors no longer available, it may be necessary to replace both at once. An air conditioner is about $400 to replace. In addition, Mr.

Golicz noticed that several boilers had been replaced, and three more (at $3,000 to $5,000 each) could require replacement soon. Leakage around water heaters indicated that three ($1,200 each) would require replacement soon. Mr. Golicz indicated that 80% of the units (269) had the original carpet. If 49 were done immediately, then the remaining 220 units would need carpet as quickly as possible to retain the 95% occupancy. This would require $176,000 over a very short time. The debtor's allocation of a replacement reserve of $2,000 per month is grossly inadequate. Its income is not sufficient to support a higher reserve. Without sufficient reserves and without a sufficient cash cushion, a plan could not be effectuated, even if it could be confirmed.

There is an additional indication that the debtor's projections cannot support confirmation of a plan. As was indicated above, Mr. Golicz based his valuation partly on a potential income projection that is lower than that projected by the debtor. He assumed occupancy at 90% and a net operating income of $752,532 per year. Capitalized at 9.5%, the rate used by Mr. Golicz, this results in an income approach value of $7,900,000. The debtor assumes 95% occupancy by year end and projects net operating income for 1989 at $867,598. Capitalized at 9.5%, the value using the income approach would be $9,132,611. The court could not confirm a plan that uses one income figure to arrive at the value of the property and the level of secured and unsecured claims under 11 U.S.C. § 506, but that uses another income figure to support the debtor's ability to perform under the plan. *In re Chandler & Chandler Motor Inns, Inc.*, 93 B.R. 755 (Bankr.N.D.Fla. 1988). If the debtor can truly produce net operating income of $867,598 per year, the court may, at the hearing on confirmation, be obliged to find a higher value than the value stipulated to at this hearing. This means that O & G's claim is accruing secured interest during the pendency of this case. This would raise O & G's interest in the collateral as of the effective date of the plan, and the amount that would have to be paid O & G under a plan would likewise

increase. Any increase in the amount of O & G's secured claim further undermines feasibility, even at the debtor's optimistic income projections. If the debtor cannot produce its projected net operating income, then it clearly cannot pay even a fair rate of interest to O & G under 11 U.S.C. § 1129(b)(2)(A)(i)(II), let alone any principal payments, prepetition real estate taxes, expected road assessments, or unsecured creditors.

The only answer to inadequate cash flow would be a plan calling for negative amortization; that is, interest on secured claims would not be paid currently but would be added to principal and paid when income is higher or upon sale. Such a plan is not necessarily unfair per se under 11 U.S.C. § 1129(b)(2)(A)(i)(II). *In re Spanish Lake Associates,* 92 B.R. 875 (Bankr.E.D.Mo. 1988). *See, contra, e.g., In re McCombs Properties VII, Ltd.,* 91 B.R. 907 (Bankr.C. D.Cal.1988). However, the income that the debtor could generate using its rosiest expectations would still be inadequate to maintain the operation and to replace carpet, appliances and equipment as needed. The added cost of interest on deferred interest is one more element of impossibility.

The second alternative of refinancing likewise does not appear viable. Mr. Chaney gave five "plans" for possible refinancing:

1. *HUD loan which is 80% government insured.* Mr. Chaney stated that this type of financing had never been used for limited partnerships in which he was involved, and he could offer no information concerning the feasibility of obtaining such financing.

2. *Co-insured § 223(f) HUD loan.* Ninety to ninety-five percent would be guaranteed by HUD and the balance by a private lender. This type of financing was used by Century Capital Group for an apartment complex in Janesville, Wisconsin. The amount that could be borrowed under this program is calculated based on the market value of the property 18 months after purchase and after improvements agreed upon by the borrower and lender. No application has been made because there is a ¼% to ½% application fee, and Mr. Chaney felt there was little chance of obtaining financing before occupancy is at 90%. Also, an appraisal in a particular format must be provided. Mr. Chaney did not think the Golicz appraisal would qualify, and he had taken no action to obtain one that would qualify.

3. *Loan from a private lender at a low rate, 7% to 10%, with a 90% loan to value ratio.* Mr. Chaney did not offer any proof that this type of loan would be available, nor that the debtor would qualify. He did state that the bankruptcy of the borrower would be a negative factor and that occupancy should be at 90% before application. Also, 90% of the present value would be only $7,200,00, which is not enough to satisfy secured claims. It is not clear how the shortfall would be handled.

4. *Voluntary workout.* This is obviously not an option, given the vigor with which this motion was litigated.

5. *Court approved plan of reorganization.* Mr. Chaney admitted that he had no proposal at this time. Also, the discussion above makes clear that there are legal and practical impediments to being able to confirm and effectuate a plan. The evidence presented to the court compels the conclusion that these impediments are insurmountable.

Finally, allowing the debtor to remain in possession to sell the property, its third option, could not be regarded as fair and equitable to O & G. *In re Development, Inc., supra,* at 1005-6. Mr. Golicz estimated that it would take six months to a year to sell the property at its highest potential price. Given its present condition and occupancy, a quick sale is unlikely because financing would be difficult to obtain. The appraisal indicates that it probably could not be sold at a high enough price to cover all of O & G's secured claim; therefore, no other creditor would benefit by the debtor's remaining in possession. O & G can only be harmed by losing another year's interest and by having to foreclose anyway if the property is not sold. O & G are sophisticated real estate investors who are better

able than the debtor to look out for their own interests.

## EXCLUSIVE PERIOD TO PROPOSE PLAN

■ At the time of the hearings on these motions, the debtor had no outline of a plan proposal. It is now two months after the original exclusive period expired, and no plan has been filed. O & G indicated that they wish to file a plan, and there was testimony that they have the financial wherewithal to execute one. In light of this lack of progress, the possible existence of a competing plan, and the court's decision lifting the stay with respect to the debtor's sole asset, the debtor's motion to extend its exclusive period to file a plan under 11 U.S.C. § 1121(b) is denied. *In re Southwest Oil of Jourdanton, Inc.*, 84 B.R. 448 (Bankr.W.D.Tex.1987).

## PROPERTY MANAGER

The question of whether a property manager is a professional person requiring court approval under 11 U.S.C. § 327(a) does not appear to be an issue squarely addressed by courts in previous cases. If the manager does require approval for appointment, it would also be subject to the limitations of 11 U.S.C. § 327(a); that is, it must be a disinterested person. If court approval is not required, neither is disinterestedness. The threshold issue of CMG's status as professional or not under 11 U.S.C. § 327(a) is, therefore, critical to its continued involvement.

The court recognizes that the disqualification of CMG as a player in this scenario would be disruptive to the debtor. Jungbacker and Chaney are general partners of the general partner of the debtor and the only shareholders of the general partner's third general partner. They have, as the only shareholders of CMG's parent company, a mechanism in place to manage and control the debtor's property. Requiring the removal of CMG would no doubt result in diversion of the principals' time and attention away from other aspects of the debtor's reorganization and other Chapter 11 reorganizations in which those two individuals are involved. Since CMG is not being paid a management fee at this time, there could also be an expense related to hiring another manager. The period of time that the debtor remains in possession of the property may be short, and change at this point would probably not be prudent.

■ The debtor argues that CMG is not a professional person subject to court approval and the disinterestedness requirement of 11 U.S.C. § 327(a). The latter is a significant obstacle. Although the debtor argues that CMG is disinterested even if the property manager is a professional person, that argument simply falls flat. Can the subsidiary of the general partner of the general partner of the debtor be disinterested? The definition of "disinterested person" requires that the person not be an "insider." 11 U.S.C. § 101(13)(A). The definition of "insider" includes a list of relationships that are not exhaustive. Among others, "insider" includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(30)(E). "Affiliate" means an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement." 11 U.S.C. § 101(2)(D). CMG has certainly been managing all of the property of the debtor under its management agreement. *See also* 11 U.S.C. § 101(30)(F) (insider includes "managing agent" of the debtor); *In re National Real Estate Limited Partnership II, supra,* at 991. Even though CMG is not a general partner of the debtor (11 U.S.C. § 101(30)(C)(iv)), it is a subsidiary of the corporation that is the general partner of the general partner of the debtor. Layers of entities are added, but there are no additional human beings other than Jungbacker and Chaney with ownership or control rights that are interjected into those layers. Therefore, CMG is not a disinterested person.

■ The court in *In the Matter of Park Terrace Townhouses v. Wilds*, 852 F.2d 1019 (7th Cir.1988), assumes that the manager is a professional person under 11 U.S.C. § 327(a). In that case (*"PTT"*), the

debtor, as seller, entered into a sales contract with Mr. Wilds for the townhouses owned by the debtor, subject to financial terms to be negotiated later with third parties. The agreement provided that "Seller shall deliver to purchaser *full and complete possession and management* of Park Terrace following the execution of this agreement." (Emphasis added.) No salary or other compensation was provided pending final sale. After Mr. Wilds managed the property for several months, apparently quite effectively, the debtor sold the property to another party with court approval. Mr. Wilds applied for compensation as a property manager as an administration expense. The Court of Appeals noted that "[t]he bankruptcy court found that PTT regularly employed professional persons to assume the responsibilities in question assumed by Wilds." *Id.* at 1022. The court allowed compensation to Wilds under 11 U.S.C. § 327(b), even though he had not been appointed by the court under 11 U.S.C. § 327(a), because professional persons regularly employed by the debtor on salary are compensable without court approval. 11 U.S.C. § 327(b). Since the persons previously doing Mr. Wild's work were salaried, he also qualified for compensation under 11 U.S.C. § 327(b).

In this case, CMG's compensation was based on a percentage of gross receipts, less security deposits, and was not a salary or set fee. *See In re Four Star Music Co., Inc.*, 42 B.R. 191, 195 (Bankr.M.D.Tenn. 1984); *In re Cummins*, 8 B.R. 701 (Bankr. C.D.Cal.1981) (real estate broker on commission did not qualify for compensation without court approval under 11 U.S.C. § 327(b)). Accordingly, if CMG is a professional person, qualification for compensation without court appointment under 11 U.S.C. § 327(b) is not available. Although CMG would waive prepetition fees, its application does not offer postpetition services free of charge.

It does not appear that the issue of whether a property manager met the evolving case law definition of a professional person was contested or analyzed in *PTT*. It appears that the court could also have allowed compensation under 11 U.S.C.

§ 503(b)(1)(A), and the result that could have been achieved under either section prevented an obvious injustice to Mr. Wild. Perhaps such analysis was unnecessary in that case. In many instances in which the courts have dealt with the employment or compensation of professional persons, their status as such is assumed rather than contested. *See In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1011 (E.D. Pa.1986), and numerous examples cited therein. Issues that have been resolved without having been contested do not have the persuasive force of issues that are fully litigated. *In re Stegall*, 865 F.2d 140, 142 at 3 (7th Cir.1989); *U.S. v. Kucik*, 844 F.2d 493, 498 (7th Cir.1988). Similarly, *In re Hooper, Goode Realty*, 60 B.R. 328 (Bankr. S.D.Cal.1986), dealt with the appointment of managers as principals of the debtor under local rule, rather than as professionals per se, and is not applicable to this case.

It appears to this court that the duties contemplated by and for CMG are distinguishable from those assumed by Mr. Wilds in *PTT*, and in this case the property manager is not a professional person.

What constitutes a professional person under 11 U.S.C. § 327(a) was summarized in *In the Matter of Seatrain Lines, Inc.*, 13 B.R. 980 (Bankr.S.D.N.Y.1981), which found that maritime engineers were not professional persons as that term is used under the Bankruptcy Code. While engineers may be highly educated and have specialized expertise in their field, they do not have a central role in the administration of the bankruptcy case. *Id.* at 981. They are important to the functioning or mechanics of the debtor's business, but their employment was not sought because of a need that arose incident to the bankruptcy. Such a role may be contrasted with that of an attorney who appears in bankruptcy proceedings, an appraiser required to value property of the estate, a realtor disposing of property of the estate, or an accountant responsible for tax and court reporting requirements. While a property manager may consider himself or herself a "professional," this court is not persuaded that the person or company that

rents apartments and arranges for maintenance is any more professional, in the bankruptcy context, than a maritime engineer or lobbyist. Such services are necessary whether a Chapter 11 has been filed or not, and the nature of the services does not change significantly on account of the bankruptcy.

■ Whether the debtor employed the particular type of professional in its normal business operation before bankruptcy may be a consideration in determining professional status in relation to the bankruptcy. The practices of similar businesses in that regard are also relevant. *In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.1986) (lobbyists are not professional persons under 11 U.S.C. § 327(a)). *See also In re Carolina Sales Corp.*, 45 B.R. 750 (Bankr.E.D.N.C.1985) (management consultants who had no inside relationship to the debtor were professionals). Day to day management of an apartment complex is a necessity regardless of the existence of the bankruptcy.

■ The degree of autonomy and discretion exercised by a professional may be an additional factor in determining whether a person is a professional, hence the requirement that the professional be disinterested. *In re Frederick Petroleum Corporation*, 75 B.R. 774, 780 (Bankr.S.D. Ohio 1987). In contrast with the present case, the property manager for PTT had unfettered discretion in how the property was managed. The contract for sale gave him "complete possession and management." Here, the debtor has not delegated management authority to another party. John Helling, President of CMG, testified that he has not been asked to participate in the Chapter 11, and his day to day activities have not changed significantly since the filing. His input in formulating projections was minimal. Furthermore, the management contract does not delegate to CMG the right to set rents, to make nonrecurring expenditures over $2,500, or even to employ personnel without the owners' approval. As a practical matter, the same individuals that make decisions for the owner are also the officers and directors of CMG and the own-

ers of CMG's parent. Peel away the entities, and the debtor is in complete control.

The policy behind the appointment of professionals is sound. A debtor should not be stripped of assets to the detriment of creditors by professional interlopers rendering services to squeeze the last drop of vital juices out of the debtor. *In re Carolina Sales Corporation*, 45 B.R. 750, 753 (Bankr.E.D.N.C.1985). However, here we have the sole asset of the debtor being run by principals of the debtor, albeit in a slightly different capacity. Who else would the creditors expect to be running the show? It is contemplated by the Code that the debtor will continue to operate its business unless and until an independent trustee or examiner is appointed. 11 U.S.C. § 1104. It makes no sense to allow the debtor to manage the property under 11 U.S.C. § 1104, but not to allow it to manage the property using a corporation controlled by its principals, probably with the same personnel. The requirements of 11 U.S.C. § 1104 for appointment of a trustee or examiner should not be sidestepped by the unwarranted use of 11 U.S.C. § 327(a). CMG is not an independent professional person, and this court finds that 11 U.S.C. § 327(a) does not apply. Since court approval is not necessary for CMG's employment, the debtor's motion for such approval is denied.

■ It should not be inferred from this ruling that the court has no say in the management of the debtor's estate. A substantial number of the projects under CMG's management are in Chapter 11 or in default. The condition of the property has deteriorated while CMG was being paid a substantial management fee.

Under 11 U.S.C. § 1107(a), the court may prescribe limitations on the debtor in possession's operation of the debtor's business. Ordinarily, payment of an agent managing the property under the direction of the owner would be made in the ordinary course of business without court approval. In this case, however, the relationship between the debtor and CMG and CMG's past performance suggest that court scrutiny is warranted. Therefore, be-

fore any payment is made to CMG by the debtor, CMG shall file an application under 11 U.S.C. § 503 and shall give notice to secured creditors and the United States Trustee with opportunity for hearing.

This decision shall constitute the court's findings of fact and conclusions of law under Bankruptcy Rule 7052. An order consistent with this decision will be entered.

## ORDER

For the reasons states in the court's decision on this date,

IT IS ORDERED:

1. The automatic stay is modified to permit J. Marshall Osborn and Arthur G. Grandlich to continue their foreclosure action on the debtor's real estate. At Osborn and Grandlich's request, the stay shall be lifted without further notice.

2. Debtor's motion to extend its exclusive period for filing a plan is denied.

3. Debtor's motion to appoint Century Management Group, Ltd. as its property management firm is not necessary and, accordingly, is denied.