In re M & S ASSOCIATES,
LTD., Debtor.

**Bankruptcy No. 90–51840–RBK.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 17, 1992.

P.J. Murphey Harmon, Houston, Tex., for M & S Associates, Ltd.

John T. Sanders, IV, San Antonio, Tex., for Resolution Trust Corp.

## AMENDED OPINION

RONALD B. KING, Bankruptcy Judge.

This Chapter 11 case was filed by M & S Associates, Ltd. (the "Debtor") on December 27, 1989, in the Southern District of Texas. The case was subsequently transferred to the Western District of Texas. Upon rehearing, the Debtor's First Amended Plan of Reorganization (the "Plan") raises the issues of whether the principal secured creditor is unimpaired and whether the Plan is feasible. Because the principal secured creditor is impaired and the Plan is not feasible, confirmation of the Plan will be denied.

## I.

## FACTS

The Debtor's only assets are three Texas apartment complexes: Hunterwood Apartments, located in Houston; Stoneleigh Apartments, located in San Antonio; and Willow Glen Apartments, located in Fort Worth (collectively, the "Apartments"). The Apartments were acquired on May 31, 1986, with financing provided by Gill Savings Association ("Gill"). The Resolution Trust Corporation, as Receiver for Gill Savings Association (the "RTC"), is now the owner and holder of the three promissory notes (collectively, the "Notes") secured by the Apartments, and it is the sole secured creditor of the Debtor. The Debtor filed for Chapter 11 bankruptcy protection in order to avoid foreclosure. The RTC is the only creditor which has objected to confirmation of the Plan.

In 1986, Gill provided to the Debtor one hundred percent purchase money financing for the Apartments in order to facilitate a sale of the Apartments from other borrowers of Gill, and to keep the loans as performing assets on Gill's books. The total purchase price for the Apartments, $20,175,000, was considerably above their market value at the time of the Debtor's purchase. At the confirmation hearing, O.W. Mattison, the General Partner of the Debtor ("Mattison"), testified that at the time of the purchase, he and Gill believed that the market value of the Apartments was approximately $12,000,000 to $14,000,000. Mattison also testified that at the time of the Debtor's purchase, the occupancy level was not sufficient to generate enough cash flow to pay operating expenses, exclusive of debt service, on two of the three apart-

ments.[1]

The Notes were each secured by a Deed of Trust, Security Agreement and Financing Statement, and an Escrow Agreement for Interest Reserve. The Notes were non-recourse, but certain payments under the Escrow Agreements for Interest Reserve were guaranteed by the Debtor and its principals. The Debtor also executed a Contingent Interest Agreement Secured By Deed of Trust and an Assignment of Rents and/or Leases as additional security for each of the three loans. The three virtually identical sets of loan documents were admitted into evidence at the confirmation hearing.

The Notes were dated May 31, 1986, and were to mature on June 1, 1996, with large balloon payments due upon maturity. Payments under the Notes were "interest only" for the first five years, requiring a fixed dollar "minimum interest payment" as defined in the Notes. Principal reductions were to begin in year six. During the entire loan term, the Notes required the payment to Gill of one hundred percent of net cash flow generated by the Apartments, until all accrued and unpaid interest at the contract rate of ten percent was paid.[2] Beginning in year six, the minimum interest payment increased to two percent per annum on the outstanding principal balance, and monthly payments of principal were required from that time until maturity based on an amortization of the outstanding principal balance over thirty years at ten percent interest per annum. Beginning in year seven, the minimum interest rate increased to five percent for Hunterwood only. For years eight through ten, the minimum interest rate was five percent per annum for all three apartment projects.

The Notes provided for the capitalization of the accrued and unpaid interest, being the difference between the ten percent contract rate and the pay rate, up to a specified amount, as follows:

|  | Original Principal Amount | Maximum Accrued and Capitalized Amount | Resultant Outstanding Principal Balance |
|---|---|---|---|
| Hunterwood | $7,000,000 | $500,000 | $ 7,500,000 |
| Stoneleigh | 7,575,000 | 675,000 | 8,250,000 |
| Willow Glen | 5,600,000 | 800,000 | 6,400,000 |
| Total: |  |  | $22,150,000 |

According to the financial information in evidence, the accrued and unpaid interest has reached the maximum under each of the Notes. Assuming all future payments are made in accordance with the Notes, the approximate total balloon payments due at

1. Transcript of hearing on Chapter 11 Plan of Reorganization by Debtor M & S Associates, Ltd. at 112–13 (testimony of O.W. Mattison, III on February 26, 1991).

2. The RTC has asserted that under the Notes, the Debtor was required to pay the minimum interest payments *in addition* to paying 100% of all net cash flow generated by the Apartments (up to the contract rate of interest of 10%). This Court disagrees. Under the terms of the Notes, the Debtor was indeed required to pay to Gill 100% of the net cash flow during the loan term, until all accrued and unpaid interest at the 10% contract rate was paid in full. "Net cash flow," however, was defined as gross revenues minus expenses, and "expenses" were defined to include debt service. Thus, minimum interest payments were an allowable expense of the Apartments, and were paid from gross revenues prior to the calculation of net cash flow. Further, *the testimony of the RTC's witness* at the confirmation hearing, the attorney for Gill who prepared the loan documents, supports this interpretation. *See* transcript of hearing on Chapter 11 Plan of Reorganization by the Debtor M & S Associates, Ltd. at 66–69, 78, 83–85 (testimony of Faye Bracey on February 26, 1991).

maturity on June 1, 1996, would be as follows:

| | |
|---|---|
| Hunterwood | $ 7,245,000 |
| Stoneleigh | 7,972,000 |
| Willow Glen | 6,186,700 |
| Total: | $21,402,700 |

Under the terms of the Escrow Agreement for Interest Reserve for each of the loans, the Debtor was also required to place the amount of the minimum interest payment in an escrow account with Gill, at the beginning of each of the first five years of the loans, in the amount of $110,000 per annum for Hunterwood, $151,500 per annum for Stoneleigh, and $112,000 per annum for Willow Glen, for a total of $373,-500 per annum. A $373,500 escrow payment was required at the inception of the loans on May 31, 1986, and subsequent payments were due on the first through the fourth anniversary dates of the loans. The second and third escrow payments (due on the first and second anniversaries, respectively) were provided for by letters of credit at the closing, and were paid into the escrow accounts on the appropriate dates.

In May, 1989, however, the Debtor failed to tender the fourth $373,500 escrow payment. Under the terms of the loan documents, including each of the three Escrow Agreements, the Debtor was in default. After the pendency of this case, the fifth escrow payment was also not paid by the Debtor. It appears that net cash flow through the pendency of the case has been paid, although belatedly, to the RTC after the RTC's perfection of its interest in the rents. No provision was made in the Plan, however, to pay the fourth or fifth escrow payments.

The Debtor's Plan purports to treat the RTC's claim as "unimpaired," as that term is defined in section 1124 of the Bankruptcy Code. The Debtor's Plan purports to keep the contract and minimum interest pay rate structure under the Notes in effect, and to cure any past defaults at confirmation so that the RTC is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. The Disclosure Statement expressly provides that the RTC is unimpaired and, as such, has no right to vote either for or against the Plan because its class is deemed to accept the Plan. The RTC objects to confirmation, asserting that it is impaired, that it rejects the Plan, and that the Plan does not meet the confirmation standards of section 1129 of the Bankruptcy Code.

The first issue which will be discussed is whether the Debtor has established that its Plan satisfied the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. The second issue is whether the RTC is impaired under the Plan. If the RTC is impaired, the Plan cannot be confirmed under section 1129(a)(8) of the Bankruptcy Code because the Plan assumes a deemed acceptance by the RTC, and it is clear that the RTC strongly rejects and objects to the Plan.

## II.

## FEASIBILITY

### A. General Requirements.

The bankruptcy court must be satisfied that a reorganization plan complies with all of the requirements of section 1129(a) of the Bankruptcy Code in order to confirm a plan. The proponent of the plan has the burden of establishing that the plan complies with these requirements. *In re Guilford Telecasters, Inc.,* 128 B.R. 622, 625 (Bankr.M.D.N.C.1991); *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 505 (Bankr. S.D.Tex.1989). One of the requirements for confirmation of a Chapter 11 reorganization plan is that it be feasible, in that it is "not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11) (1988).

The bankruptcy court has an affirmative obligation to scrutinize a reorganization plan to determine whether it is feasible. In order to confirm a plan, the court must make a specific finding that the plan, as proposed, is feasible. *Lakeside Global,* 116 B.R. at 506 (*citing Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, 1341 (8th Cir.1985); *In re*

*Johns–Manville Corp.*, 68 B.R. 618, 635 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987); *In re Neff*, 60 B.R. 448, 453 (Bankr.N.D.Tex.1985), *aff'd*, 785 F.2d 1033 (5th Cir.1986); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J.1980)).

■ The feasibility test contemplates the probability of actual performance of the provisions of the plan, and whether the things to be done under the plan can be done as a practical matter under the facts. *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985). In determining feasibility, success need not be guaranteed, but the court must be satisfied that there is a reasonable prospect of a plan's success and that it is workable. *Guilford Telecasters*, 128 B.R. at 627 (*citing Monnier Bros.*).

■ Traditional factors have evolved which courts utilize in their feasibility analysis, including: (1) the adequacy of the debtor's capital structure; (2) the earning power of the debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) and any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *Guilford Telecasters*, 128 B.R. at 627; *In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir.1986); and *Clarkson*, 767 F.2d at 420. The availability of credit, both capital and trade, the adequacy of funds for equipment replacement, and provisions for adequate working capital are other factors which should be examined. *In re Elsinore Shore Assocs.*, 91 B.R. 238, 275 (Bankr.D.N.J.1988).

■ Income projections offered in support of reorganization plans "must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic." *In re Sound Radio, Inc.*, 103 B.R. 521, 524 (D.N.J.1989), *aff'd*, 908 F.2d 964 (3d Cir.1990) (citation omitted); *see also In re Canal Place Ltd.*, 921 F.2d 569, 579 (5th Cir.1991). In addition, the proponent must prove that the debtor will have available credit and the ability to meet capital expenditures. In *Sound Radio*, the plan proponents had submitted a financial plan and presented testimony supporting its accuracy. The district court found, however, that the bankruptcy court's opinion made no *explicit finding* as to whether the debtor's profits would enable it to service its concededly large debt over a reasonable time, and remanded the matter to the bankruptcy court for a determination on that issue.

The Court of Appeals for the Ninth Circuit found that a reorganization plan satisfied the feasibility requirement in *In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir.1986). The debtor was a family owned corporation whose principal business activity was land management. In support of a feasibility finding, the court noted that the debtor presented ample evidence to demonstrate that the plan had a reasonable probability of success, the debtor provided both "conservative" and "best case" projections, and the debtor's experts testified that the debtor's assets were attractive and in demand. *Id.* at 1364.

The only financial projections provided to the Court were contained in the Debtor's Disclosure Statement.[3] At the confirmation hearing, the Debtor presented little evidence regarding the feasibility of its

---

**3.** The operating and value projections contain the following assumptions for all three apartment projects:

| | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|
| Income inflation | 6% | 6% | 3% | 3% |
| Expense inflation | 3% | 3% | 3% | 3% |
| Vacancy | 5% | 5% | 5% | 5% |

| | Capitalization rate |
|---|---|
| Hunterwood | 11.00% |
| Stoneleigh | 8.00% |
| Willow Glen | 8.75% |

Plan.[4] The projections, which Mattison assisted in preparing, were not introduced into evidence. Mattison testified simply that in his opinion, based on the projections and his experience, the properties would generate sufficient cash flow during the period of the Plan to make all the required minimum payments to the RTC, including principal payments which were required under the Notes beginning in year five. He also stated that, in his opinion, the confirmation of the Plan would not be followed by additional reorganization. He admitted that the Debtor has no other source of income other than the net cash flow generated by the Apartments, that he does not anticipate the availability of any other source of funding, and that the Debtor cannot make principal reductions except from net cash flow.[5] No independent expert testimony was adduced regarding the feasibility of the Plan.

### B. Negative Amortization.

Negative amortization can be defined as:

[A] provision wherein part or all of the interest on a secured claim is not paid currently, but instead is deferred and allowed to accrue. The accrued interest is added to the principal and paid when income is higher or when the collateral is sold. The overall rate of interest on the claim is referred to as the accrual rate. The rate to be actually paid on a monthly basis is referred to as the pay rate. The difference between the two represents the extent of negative amortization.

*In re Club Assocs.*, 107 B.R. 385, 398 (Bankr.N.D.Ga.1989) (citation omitted). Negative amortization may also be described as "deferral of interest" or "accrual of interest." *Id.*

A reorganization plan which provides for negative amortization is not *per se* inequitable and a bar to confirmation, but may be highly suspect. *See Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174 (9th Cir.1992); *In re D & F Constr.*, 865 F.2d 673, 676 (5th Cir.1989); *Club Assocs.*, 107 B.R. at 398; *In re Century Inv. Fund VII Ltd.*, 96 B.R. 884, 891 (Bankr.E.D.Wis.1989); and *In re Anderson Oaks (Phase I) Ltd.*, 77 B.R. 108 (Bankr. W.D.Tex.1987). In considering the confirmation of a plan with a negative amortization feature, two commentators have observed that courts have "generally performed either a 'feasibility' or 'fair and equitable' analysis of the plan if the treatment is rejected by the affected class." Gerrit M. Pronske & T. Patrick O'Rourke, *Fifth Circuit Survey—Bankruptcy*, 21 Tex.Tech L.Rev. 111, 125–126 (1990). "In determining whether deferral of interest is feasible, the court must not be left to speculate as to whether the required payments can be made both during the term of the plan and at the proposed maturity date." *Id.* at 130. Messrs. Pronske and O'Rourke further suggest that although some degree of speculation as to income producing real estate is inevitable, "where the level of speculation is high enough to place a substantial burden of the debtor's risk of failure on the secured creditor, the court should deny confirmation." *Id.* at 133. This Court agrees.

Courts have found plans providing for negative amortization not feasible where they are required to speculate as to future values and cash projections. *See Anderson Oaks* (cash flow analysis showed negative amortization for twelve years be-

---

**4.** The Debtor, in the "Evaluation of Risk" portion of its Disclosure Statement, listed (without evaluating) certain risks which it stated must be "noted" in reviewing the Reorganization Plan, which are:

    (1) the inability to find purchasers for the assets if ultimately sold;

    (2) the inability to refinance the properties in 1996;

    (3) decline in rents or the rental market over the course of the Plan; and

    (4) the requirement that tax liabilities be satisfied as incurred post confirmation.

No evidence was provided at the confirmation hearing, however, to assist in the evaluation of these risks.

**5.** Transcript of hearing on Chapter 11 Plan of Reorganization by Debtor M & S Associates, Ltd. at 48–52, 56–59 (testimony of O.W. Mattison, III on February 26, 1991).

fore positive amortization of a thirty year term began); and *In re Edgewater Motel, Inc.*, 85 B.R. 989 (Bankr.E.D.Tenn.1988) (ability of debtor to retire construction lender's secured claim with balloon payment in ten years was at best speculative). Courts have, however, approved plans providing for negative amortization in which the property securing the claim had value substantially in excess of the balloon payment required in the debtor's plan. *See In re Pikes Peak Water Co.*, 779 F.2d 1456 (10th Cir.1985) (value of property more than $600,000 greater than secured lender's claim); and *Club Assocs.* (ultimate resale value of property at end of ten year term well in excess of what would be the remaining amount of claim at that time, and negative amortization was provided for in the original loan).

■ In this case, negative amortization was provided for in the original Notes, rather than being forced upon the lender through cram down. The contractual minimum interest payments under the Notes were far below the contract interest rate of ten percent. In addition, the Notes provided for the capitalization of accrued but unpaid interest up to specified capped amounts, which capped amounts have been reached. Even though the Plan merely carries forward the consensual negative amortization and low pay rate features of the debt, the feasibility of the Plan should be analyzed with the heightened level of scrutiny as would be utilized in analyzing any negative amortization plan. Thus, the court should not be left to speculate as to the ability of the Debtor to make the payments owing during the Plan, and perhaps more importantly, the ability of the Debtor to pay balloon payments due at the maturity date.

C. Balloon Payments.

■ In assessing the feasibility of the Plan, the Debtor's ability to pay the balloon payments due June 1, 1996, totaling approximately $21,000,000, must also be considered. As already noted, the Debtor's only source of income is the net cash flow generated by the Apartments, and the Debtor can make principal reductions only from net cash flow. Some reorganization plans providing for balloon payments have been found infeasible. *See Lakeside Global;* and *Edgewater Motel.* Other reorganization plans providing for balloon payments have been found feasible. *See Club Assocs.* (resale value of apartment complex, when balloon payment would be due, well in excess of the remaining amount of the mortgagee's claim); and *Guilford Telecasters* (payments made by guarantors reduced debt to amount that was feasible for debtor to pay).

In *Lakeside Global*, the debtor's only assets were two apartment complexes with little or no equity which secured outstanding promissory notes with balloon payments due at the termination of the plan period, approximately three years later. *Lakeside Global* found that the proposed plan was not feasible because financial realities did not accord with the proponent's projections. The plan proposed to generate approximately $9,100,000, primarily from the proceeds of a future sale or refinancing of the two apartment projects, and also from net operating income, to enable the debtor to make the two balloon payments which were due within three years. The court stated "[w]hen virtually all of the income generated from the property 'is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code.'" 116 B.R. at 507 (citing Walter J. Blum, *Treatment of Interest on Debtor Obligations in Reorganizations Under the Bankruptcy Code*, 50 U.Chi.L.Rev. 430, 455 (1983)).

In making its feasibility determination, *Lakeside Global* found that the earning power of the business was questionable, that the proponents contemplated a significant increase in the value and marketability of the projects by the time the notes matured, and that the projects were valued at the time of the confirmation hearing at less than half the projected sales price. The court also noted that there had been no recent offer to purchase the properties, and there was, at that time, "no market in the Houston, Texas area for a one hundred

percent loan on an apartment project," which was in essence what was being asked of the lenders. The court further noted the proponent's admission that prevalent transactions in the market at the time involved distressed real estate with leveraged seller financing or consensual plans. The court was, therefore, not persuaded that within the time period contemplated by the plan, there was a reasonable probability of a sale or refinancing of the projects, and a reasonable likelihood of a sufficient increase in the value of the projects, which would support a feasibility finding.

In *Edgewater Motel,* a ten year reorganization plan failed to meet the feasibility test. The debtor had obtained a construction loan for the construction of its resort motel, and had a commitment for permanent "take out" financing which it subsequently lost prior to seeking Chapter 11 bankruptcy protection. The debtor proposed to repay the debt owing to the construction lender based on a twenty-five year amortization with nine percent interest per annum and a ten year balloon, and to defer approximately $1,000,000 in payments due in the first three years of the plan to year eight. The debtor further proposed to either sell or refinance at the end of its ten year plan. Although the debtor projected sufficient income to make payments due under the plan, the court was not satisfied with the debtor's ability to meet the projections, in light of the substantial amount of deferred payments, and considered the ability of the debtor to retire its major claim in year ten to be speculative.

### D. Feasibility Conclusion.

■ Confirmation should be denied based upon a lack of feasibility of the Plan to repay the principal indebtedness. Even if the Debtor can utilize net cash flow to stay current on its pay rate under the Notes prior to maturity on June 1, 1996, it has no source of funds with which to repay the principal debt at maturity. It is highly unlikely that the Apartments could be sold or refinanced to repay the entire unpaid principal balance during or at the end of the Plan. Confirmation of the Plan would

merely allow the Debtor to postpone the inevitable, and to gamble, with the RTC's money, on the long shot possibility of a drastic improvement in the real estate market.

### III.

### IMPAIRMENT

■ The classification of claims and interests under the Plan is as follows:

Class 1 Claims for Administrative Expenses

Class 2 Priority Claims

Class 3 RTC Claim

Class 4 General Unsecured Claims

Class 5 Interests of Partners in Debtor

According to the Disclosure Statement, Classes 1 through 3 are unimpaired, and Classes 4 and 5 are impaired. Thus, the Debtor's Plan treats the RTC's claim as "unimpaired," as that term is defined in section 1124 of the Bankruptcy Code. As an unimpaired class, the RTC would have no right to vote either for or against the Plan under section 1126(f) because its class is conclusively presumed to have accepted the Plan. *In re Madison Hotel Assocs.,* 749 F.2d 410, 418 (7th Cir.1984); *In re Holthoff,* 58 B.R. 216, 219 (Bankr.E.D.Ark. 1985). The Debtor's Plan would keep in effect the contract and minimum interest pay rate structure for all three Notes, and proposes to cure any past defaults at confirmation so that the RTC is unimpaired and cannot vote.

The RTC asserts that it is impaired. If the RTC is impaired, the Plan cannot be confirmed under section 1129(a) of the Bankruptcy Code because the RTC rejects the Plan. The RTC asserts that it is impaired under the Plan because the Debtor failed to make two of the required annual deposits under the Escrow Agreements for Interest Reserve for each of the Notes (collectively, the "Escrow Agreements"), and that such defaults are not cured under the Plan. The Escrow Agreements required that the Debtor pay a total of $373,-500 per annum, at closing and on the first four anniversary dates of the loans, into an

escrow account to secure payment of the minimum interest payment and other expenses, as defined in the loan documents. It is undisputed that on the third and fourth anniversary dates of the Notes, May 31, 1989, and May 31, 1990, the Debtor failed to place the required $373,500 payments into escrow. Under the Notes and Escrow Agreements, such failure to timely make the escrow deposits constituted a default.

The Debtor asserts, however, that such defaults have been cured. Under the Notes, the minimum interest payments were to be paid on a monthly basis. The Debtor argues that because all net cash flow has been passed through to the RTC, and the total net cash flow for each Note year was more than the total minimum interest payments due, there would have been no drawdown on the escrow accounts and the defaults under the Notes have been cured.

In connection with the payment of the escrow deposits, paragraph 4 of the Escrow Agreements states as follows:

If at any time Owner fails to make the deposits as set forth above or withdraws sums from the Escrow Account for reasons other than those specified herein, such occurrence shall be deemed an event of default under the Promissory Note and the Deed of Trust and all sums held in the Escrow Account shall be deemed interest on the Promissory Note immediately due and payable to GILL.

Paragraph 1 of each of the Escrow Agreements provided, in part:

On the third anniversary date of the Promissory Note, Owner shall place the sum of [$373,500 total] in the Escrow Account to be drawn upon as needed to pay Expenses of the Property including the debt service payments as set forth in the Promissory Note in the fourth year of the Promissory Note.

A similar provision required payment into the Escrow Account on the fourth anniversary. In addition, paragraph 2 provided:

The sums in the Escrow Account shall bear interest at the insured money market rate paid by Gill with all interest accumulating thereon remaining in the Escrow Account to be used to pay Expenses on the Property, including the Minimum Interest Payments due under the Promissory Note.

The Escrow Agreements provided that the escrow account and accumulated interest were required to be maintained as a source of funds for payment of expenses, including debt service for the fourth and fifth years. The expenses which could be paid from the escrow accounts were *not* limited, however, to the fourth and fifth loan years. Because two annual deposits of $373,500 each were not made into the escrow account, the RTC does not have the cushion for the payment of expenses of the Apartments as provided for in the loan documents.

■ Impairment under section 1124 has generally come to mean any alteration of the holder's legal, equitable, or contractual rights, unless payment in cash of the allowed amount of the claim is made on the effective date of the plan. *In re Block Shim Dev. Co.—Irving,* 118 B.R. 450, 454 (N.D.Tex.1990), *aff'd,* 939 F.2d 289 (5th Cir. 1991); *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 505 (Bankr.S.D.Tex.1989). Congress defined impairment in the broadest possible terms and then carved out three narrow exceptions to that expansive definition. *In re Madison Hotel Assocs.,* 749 F.2d 410, 418 (7th Cir.1984) (citing *In re Taddeo,* 685 F.2d 24, 28 (2d Cir.1982)). Unlike under the Bankruptcy Act, a claim is impaired within the meaning of section 1124 even if it is not significantly impaired. *Block Shim,* 118 B.R. at 454 (*citing In re Witt,* 60 B.R. 556, 561 (Bankr.N.D.Iowa 1986) (creditor's claim for $1,675 was impaired even though plan provided for payment to creditor of $1,600)); *see also In re Wilhelm,* 101 B.R. 120, 122 (Bankr. W.D.Mo.1989); *In re American Solar King Corp.,* 90 B.R. 808, 819 (Bankr. W.D.Tex.1988).

If the RTC is to be unimpaired, the Plan must cure any default in accordance with section 1124(2) of the Bankruptcy Code. As stated in the Senate Report on section 1124 of the Bankruptcy Code:

[A] claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crises [sic] which the plan of reorganization is intended to clear away.

*In re PCH Assocs.*, 122 B.R. 181, 199–200 (Bankr.S.D.N.Y.1990) (*citing* S.Rep.No. 989, 95th Cong., 2d Sess. 120, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5906).

The Plan makes no provision for the payment of the escrow account deposits, or the interest which would have been earned on the escrow deposits, both of which would have been available for the payment of expenses of the Apartments in the event of net cash flow shortfalls. Thus, the RTC's legal, equitable and contractual rights are *not* unaltered under the Plan, and the RTC is impaired under section 1124(2) of the Bankruptcy Code. As a member of an impaired class, the RTC has an absolute right to vote on the Plan. *American Solar King*, 90 B.R. at 817; *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 336 (Bankr.E.D.Pa. 1987). The Plan cannot be confirmed under section 1129(a) of the Bankruptcy Code, therefore, because confirmation requires the approval of all impaired classes of creditors, and the RTC, as the only member of an impaired class, rejects the Plan.

■ The only alternative for confirmation of the Plan is through the "cram down" provisions of section 1129(b) of the Bankruptcy Code. Cram down was not requested at confirmation, but in any event, the evidence showed that the Plan could not satisfy the requirement of deferred cash payments totaling at least the allowed amount of the RTC's secured claims of a value as of the effective date of the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II) (1988). The RTC was not to receive a market rate of interest which would pay the present value of the collateral, and the income projections

showed that such treatment was not feasible in any event.

## IV.

## CONCLUSION

For either of the foregoing reasons, confirmation of the proposed Plan must be denied. The automatic stay provided by section 362 of the Bankruptcy Code has terminated previously by Orders of this Court setting deadlines for the filing and confirmation of a plan of reorganization. The RTC is free, therefore, to pursue its remedies under the loan documents. An Order Denying Confirmation will be rendered contemporaneously herewith.

The prior Opinion denying confirmation is withdrawn. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52 and Fed.R.Bankr.P. 7052 and 9014. Although the RTC has other objections to confirmation, it is not necessary to discuss them in light of the foregoing.