**Walter WICK and Robert Wick, dba Green Valley News and Sun, Plaintiffs,**

v.

**TUCSON NEWSPAPER, INC.; Star Publishing Company; and Citizen Publishing Company, Defendants.**

No. Civ. 84–257 TUC–WDB.

United States District Court, D. Arizona.

Sept. 5, 1984.

Supplemental Opinion Jan. 8, 1985.

John P. Frank, Lewis & Roca, Phoenix, Ariz., Robert O. Lesher, Tucson, Ariz., for plaintiffs.

Michael J. Meehan, Thornton E. Robison, Tucson, Ariz., Lawrence W. Boes, New York City, for defendants, Star Publishing.

Lawrence J. Aldrich, John Stuart Smith, Rochester, N.Y., for defendant, Citizen Publishing Co.

## ORDER

BROWNING, District Judge.

This matter has come on before the Court on the Plaintiffs' Motion for Partial Summary Judgment (as to Count III of the Complaint) and for Permanent Injunction, and on Defendants' request for a Rule 56(d) finding. The Court, having considered the oral argument of counsel, the briefs of the parties, and materials submitted on behalf of both parties, took the matter under advisement. The matter now comes on for decision.

The pertinent facts in this matter are that the Plaintiffs are publishers of the Green Valley News & Sun, a biweekly newspaper circulated principally in Green Valley, Arizona. Green Valley, Arizona is a community approximately 25 miles South of Tucson, Arizona, and is identifiable by its own zip code, to-wit: 85614.

Defendants, Arizona Daily Star and the Tucson Citizen are daily newspapers sold

and distributed throughout the metropolitan Tucson, Arizona area, including Green Valley. Indeed, both papers are sold throughout Arizona and particularly in Southern Arizona. Single copy as well as subscription sales occur in Green Valley.

Tucson Newspapers, Inc. (TNI) is a corporation operated pursuant to a joint operating agreement between the two daily newspapers. It is owned one-half by Star Publishing Company and one-half by Citizen Publishing Company and employs an advertising sales staff, all the printers, pressmen and other production and maintenance employees responsible for the physical production and distribution of both newspapers, as well as an advertising staff and circulation staff to handle subscriptions and single copy sales. The two daily Tucson newspapers maintain separate reportorial and editorial staffs, which remain wholly separate and apart from each other.

A four-page newsprint jacket appears in the Arizona Daily Star on a weekly basis. It is named THE ROUNDUP. It contains, as filler inside of the jacket, slick material and purely advertising circulars called inserts, preprints, or the like. It is distributed as a part or section of the Arizona Daily Star once a week to all subscribers and single copy purchasers.

The Tucson Citizen prints and distributes the BULLETIN BOARD on an identical basis and in an identical manner.

Representative copies of each have been furnished to the Court and are part of the record herein. The parties urge the Court to find them representative and controlling with regard to the issues hereinafter delineated. The copies provided are publications from July 4, 18, and 25, 1984.

The newsprint portion of THE ROUNDUP and the BULLETIN BOARD contains advertising as well as non-advertising matter. The non-advertising matter is composed of such items as a calendar of current events, feature stories, and other news items. The Court, however, specifically finds that the printed non-advertising content of these 4-page jackets of newsprint, is "news" within the meaning of the Newspaper Preservation Act, 15 U.S.C. § 1801, et seq. It is not this Court's intention to judge the quality or relative worth of the content of either publication, to judge whether or not it is timely, current, good or bad, current or stale, thought provoking or inane, or otherwise. Those comparisons are not called for in this case and are immaterial to the resolution of the merits of the dispute. For the Court to inject itself into judgments set forth in the immediately preceding sentence would be to inject a First Amendment issue into this case. There is not now any First Amendment issue in this case, as will be pointed out later.

In order to increase advertising revenues and circulation, each of the Tucson daily newspapers distributes the jacket and accompanying material to all of the non-subscribers in the Green Valley zip code area weekly. One week all of such non-subscribers received THE ROUNDUP by mail, together with all of its preprints, inserts and circulars. The following week the same non-subscribers received the BULLETIN BOARD by mail, together with all of its preprints, inserts and circulars. Subscribers in Green Valley, naturally, receive either or both weeklies as part of the entire daily edition of the respective newspapers.

Neither the Star nor the Citizen distributes the entire newspaper free of charge to non-subscribers, but rather only the described sections of the respective newspapers.

Upon learning that the defendant newspapers, through defendant Tucson Newspapers, Inc., intended the described distribution to non-subscribers, one of the plaintiffs contacted those newspapers and urged them not to go ahead with the non-subscriber distribution as outlined above. The defendants refused, despite the plaintiffs stated intention to bring suit if they proceeded with the distribution. This suit followed.

The defendants claimed that the plaintiffs' attempt to discourage defend-

ants from undertaking the distribution of THE ROUNDUP and BULLETIN BOARD in Green Valley, as described above, constitutes collusion and is a defense against any anti-trust enforcement which might be imposed upon the defendants by virtue of their conduct. They liken the collusion to the doctrine of "unclean hands." This Court stated, at the hearing on an earlier motion, that if it was determined that the doctrine of unclean hands was a defense to the plaintiffs' motion herein, relief would be denied. The Court does not find that the doctrine of unclean hands or the alleged collusion constitute a defense to anti-trust violation and enforcement herein. *Memorex Corp. v. International Business Machine Corp.,* 555 F.2d 1379 (9th Cir. 1977).

The Court finds that the Green Valley News is economically dependent upon its subscribers and advertisers for its continued existence.

The Court further finds that advertisers whose advertisements are distributed through the means of the BULLETIN BOARD and ROUNDUP are the same advertisers, in some cases, that the Green Valley News seeks to attract.

The Court further finds that the Tucson Daily Citizen and Arizona Daily Star are both "newspaper publications" as that term is defined in 15 U.S.C. § 1802(4).

The Court further finds that TNI is a "joint newspaper operating arrangement" between the Arizona Daily Star and Tucson Citizen as the same is defined in 15 U.S.C. § 1802(2).

The defendants submit affidavits which are here summarized and discussed. An affidavit by one of their counsel, Lawrence J. Eldridge, Esq., is not discussed as it is not found to contain probative material germane to the disposition of this proceeding.

The affidavit of Mr. Jonathon I. Kamman, managing editor of the Arizona Daily Star, states that he does not believe that THE ROUNDUP has ever had less than approximately 40% news and editorial content, as compared with 60% advertising content. His statement, however, must only take into consideration advertising content printed by Tucson Newspapers, Inc. Indeed, in this case, it is patently clear that the material inserted in the "jacket" exceeds 50% of the whole.

In reviewing THE ROUNDUP and the BULLETIN BOARD and their insert pre-print and advertising circular material, it is the finding of this Court that they contain less than 30% of news or editorial material and in excess of 70% pure advertising.

Mr. Dale Walton, managing editor of the Tucson Citizen, states, in essence, that the content of the BULLETIN BOARD was meant to be and is community news. He concludes that this was done by making it a separate part of the overall newspaper.

Mr. Thomas Jackson, general manager of Tucson Newspapers, Inc., filed an affidavit noting some of the aforesaid facts, together with the fact that the newspapers are now being mailed pursuant to a second class permit. He states that the TNI distribution of THE ROUNDUP and the BULLETIN BOARD to non-subscribers was due to advertise requests and pressure for wider distribution. He also stated that the advertisers had switched to "preprint" from "run of the press"-type advertising contained in the body of the newspaper itself. Mr. Jackson further states that it was not his intention to destroy the Green Valley News and that he communicated this to an official of the Green Valley News. He concludes, though the Court does not, that the discussion he had with the representative of the Green Valley News was an offer to engage in collusion.

Mr. Jackson cites the Court to an appendix to his affidavit, an article in a recent issue of Advertising Age dated June 14, 1984, as authoritative. The article is entitled "Newspapers, Shared Mail Digging In." Page 2 of that article contains a box "Defining the Terms." One of the terms appearing in the glossary is the term "shopper" which is defined as follows:

"Shopper: These free distribution circulars look like newspapers, but generally

have little editorial content, running between 75% and 100% advertising."

The Court finds that ROUNDUP and BULLETIN BOARD, with the material which they surround, are "shoppers" or "shopping newspapers" as the same are referred to in Advertising Age and as the same are referred to in the legislative history of 15 U.S.C. § 1802.

In *United States v. Citizen Publishing Co.*, 280 F.Supp. 978 (D.Ariz.1968), Judge James A. Walsh of this Court, concluded that the joint operating agreement between Citizen Publishing and Star Publishing was a *per se* illegal violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (unreasonable restraint of trade), and Section 2 of the Sherman Act, 15 U.S.C. § 2 (monopoly). Other portions of that comprehensive judgment are immaterial to these proceedings.

The United States Supreme Court affirmed in *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). On January 26, 1970, the District Court amended its Order and on September 29, 1970 the final Order was entered amending the Judgment by the District Court to conform to the Newspaper Preservation Act. In response to the District Court's 1968 judgment, and the affirmance thereof by the United States Supreme Court, the Congress passed a bill entitled The Newspaper Preservation Act (15 U.S.C. §§ 1801–1804) with the stated purpose of preserving the news gathering and editorial independence of two newspapers, one of which was failing as of a certain date to the point that it could not survive without being a party to a joint operating agreement. The Congress felt that the salutary effect of two independent and competitive editorial voices in the same community justified an exception to the anti-trust violations aforesaid. Nowhere does this Act state that a joint operating agreement is not a violation of the Sherman or Clayton anti-trust Acts. It merely provides an exemption from the operation of those acts for newspapers, under certain conditions.

Following the July, 1970 enactment of the "Newspaper Preservation Act" the District Court found that the previous Order for modification of the joint operating agreement should be deleted and that the restraining order and injunction set forth in the previous order should be deleted, together with a previous restriction in the Order regarding the approval of agreements and by-laws of the three corporate entities aforesaid. All of those matters had become moot with the passage of the Newspaper Preservation Act. The Court specifically found that except as to those amendments, all other paragraphs of the January 31, 1968 Judgment and Decree of the District Court should remain in full force and effect.

Both the plaintiffs and the defendants rely upon 15 U.S.C. § 1802(4) in support of their position that THE ROUNDUP and BULLETIN BOARD sections of the Star and Citizen come within its meanings and terms. That section reads as follows:

The term "newspaper publication" means a publication produced on newsprint paper which is published in one or more issues weekly (including as one publication any daily newspaper and any Sunday newspaper published by the same owner in the same city, community, or metropolitan area), and in which a substantial portion of the content is devoted to the dissemination of news and editorial opinion.

In looking at the legislative history of this Act, it is clear that the Congress meant to include only those publications which were, as it states, devoting a substantial portion of the content to the dissemination of news and editorial opinion. *See* Senate Report No. 91–535, Congress, First Session, November 18, 1969 on S. 1520 wherein it is stated:

The definition of "newspaper publication" has been drawn to exclude magazines and other "slick paper" publications as well as free circulation "shopping newspapers" and advertising circulars. Unless a reasonable portion of the publication eligible for an exemption is devoted

to news dissemination and the intent of the bill—to give financial stability to an editorial voice—cannot be served. There can be no editorial voice without a substantial amount of editorial material.

■ The defendants seem to urge on the Court that the Court find that the full edition of the Arizona Daily Star and the Tucson Citizen are newspaper publications within the meaning of § 1802(4) aforesaid. The Court so finds. Both newspapers contain significant amounts of national, international, and local news and significant and often divergent editorial opinions. They also contain totally legitimate advertising information both in the form of preprints and circulars and in "run of the press" advertising. The plaintiff, however, would have the Court consider, under the above definition of newspaper publication, only THE ROUNDUP and BULLETIN BOARD portions of the Arizona Daily Star and Citizen, together with their preprinted inserts. The approach suggested by the plaintiffs is adopted by the Court because of the fact that the entire publication is not distributed to non-subscribers in Green Valley, but only that portion set forth above.

We turn now to the previously cited editions of THE ROUNDUP and BULLETIN BOARD to determine whether or not they pass muster in light of § 1802(4) and its legislative history. The first requirement under that Section is that it be produced on newsprint paper. As noted before, both publications are partially produced on newsprint paper. The second requirement is that it be published in one or more issues weekly. The Court finds that, as the term "published" is used in the aforesaid statute, neither THE ROUNDUP nor BULLETIN BOARD is published weekly. Rather they are published biweekly. The term "publication," in order to have any meaning at all within the context of the statute, must include distribution or dissemination. Both THE ROUNDUP and BULLETIN BOARD are disseminated by mail on a biweekly basis. However, it is not only upon this distinction that the Court bases its conclusions herein. The essence of this matter is whether either ROUNDUP or BULLETIN BOARD is such that "... a substantial portion of the content is devoted to the dissemination of news and editorial opinion." The Court finds that such is not the case. The Court finds that ROUNDUP and BULLETIN BOARD, while containing news and editorial opinion, and while being publications which require editorial judgments in their compilation, do not contain a substantial portion of news reporting or editorial opinion as is contemplated by 15 U.S.C. § 1802(4). They must be considered on their own two feet (not by the dailies of which they are but a part), and when so considered, it is apparent that their principal purpose is to serve as a vehicle by which advertising circulars, preprints and slick paper advertising materials can be distributed. The Court does not so find based strictly or solely on a mathematical computation, as Advertising Age would have one do, of what is news and editorial content versus advertising content, but rather on the entirety of the publication and the purpose of the publisher as to whether it is distributing *primarily* news and editorial opinion or *primarily* advertising matter. The Court concludes that the latter is the case and that therefore ROUNDUP and BULLETIN BOARD are not newspaper publications as the same is defined in § 1802(4). The Court further finds that these publications, as distributed in Green Valley to non-subscribers, constitute "shopping newspapers" which were not intended to be included among those activities of a joint operating agreement exempt from the operation of anti-trust laws. The only thing exempted by the Newspaper Preservation Act from the operation of those laws is a newspaper publication as the same is defined in § 1802(4). That is a limited exemption and unless it is found to be applicable, the joint operation of these two daily newspapers constitutes a violation of the Sherman Act, as the same was found and stated in the extant Judgment of the District Court. Immunity from anti-trust laws is not lightly implied. *California v. Federal Power Commission*, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54

(1962). Indeed, the Supreme Court has construed anti-trust exemptions as those that must be narrowly construed. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261, 280 (1979). It seems clear from the legislative history that the intent of Congress was that the provisions of the Newspaper Preservation Act be narrowly construed and to be an exemption only within the strict delineated definitions therein contained.

Consideration should be given to the affidavit of George Ridge, a Journalism Professor and law school graduate, wherein Mr. Ridge recites his experience and the fact that he has served as an expert witness in libel and press related litigation, but never for or against either of the daily newspapers herein involved. Mr. Ridge states that he is aware of the general content and makeup of both daily newspapers. He opines that they contain substantial news and editorial opinion. The Court agrees. It is Mr. Ridge's opinion, from examination of the quoted issues of ROUNDUP and BULLETIN BOARD, that they, too, have substantial portions devoted to news and editorial opinion. That conclusory statement is rejected by the Court as contrary to the evidence submitted herein.

█ Where contradictory inferences may be drawn from undisputed evidentiary facts, summary judgment is not normally appropriate. *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir.1970). However, where the Judge is the ultimate trier of fact and a trial would not enhance the Court's ability to draw inferences and conclusions from undisputed and immutable facts, as the parties urge is the case here, then the Court is free to draw such inferences and conclusions. *Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir.1978). *See also Swart v. United States*, 568 F.Supp. 763, *aff'd*, 714 F.2d 154 (9th Cir.1983).

Having determined that the 1968 finding of this Court that violations of the Sherman and Clayton Act existed, is extant, and having found that the publication of ROUNDUP and BULLETIN BOARD, is-sued separately and without being a portion of the entire newspaper, is an activity not exempted by 15 U.S.C. §§ 1801 et seq., the Court now turns to the question of summary judgment injunction and the question of relief.

The question involving relief, by way of preliminary or permanent injunction in anti-trust cases, has been addressed in the case of *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). The argument was made in *Zenith* that the party requesting injunctive relief had failed to prove the actual fact of injury. However, the Court in *Zenith* noted that § 16 of the Clayton Act (15 U.S.C. § 26) makes available equitable remedies to private parties and invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of threatened injury. The Court specifically held that injunctive relief is "characteristically available even though the plaintiff has not yet suffered actual injury" and that all that is required is a demonstration of "a significant threat of injury from an impending violation of the anti-trust laws or from a contemporary violation likely to continue or recur." 395 U.S. at 130, 89 S.Ct. at 1580, 23 L.Ed.2d at 152. The Court finds, in the case at bar, that there is a significant threat of injury to the Green Valley News from a contemporary violation which is likely to continue or recur. In *Benda v. Grand Lodge of International Association of Machinists and Aerospace Workers*, 584 F.2d 308 (9th Cir.1978) the court set down the standard to be utilized in determining the propriety of preliminary injunctive relief. The court there articulated that standard in the following way:

> One moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and balance of hardships tips sharply in his favor. 584 F.2d at 315.

This alternate test has been used many times previously and the *Benda* court not-

ed that they are not really two entirely separate tests, but are merely extremes of a single continuum. The court went on to hold that the critical element in determining the test to be applied is the relative hardship of the parties.

Turning to the case at bar, and applying the *Benda* standard, it is apparent that the conduct of the defendants, inasmuch as it involves the same joint operating agreement at issue in *Citizen Publishing Co.*, is violative of the Sherman Act as found by the District Court in 1968. However, because of Congress' 1970 enactment of the Newspaper Preservation Act, *supra*, certain acts constituting anti-trust violations were exempted from the reaches of the aforesaid anti-trust acts. Where the clear intent of the Congress cannot be delineated or ascertained from reference to the statutory language itself reliance on the legislative history becomes necessary. Here the legislative history reveals that the distribution of slick paper, shopping newspapers or advertising circulars, under a joint operating arrangement, and separate from an editorial and news reportorial output, is prohibited.

Plaintiff has demonstrated a high probability of success on the merits and has shown, by virtue of the relevant market and respective sizes of the plaintiffs and defendants, the possibility of irreparable injury.

Applying the second prong of the *Benda* standard, it is equally clear that "serious questions" are definitely raised by the allegations of Count Three of the Complaint and the evidence proffered in support of the Motion. One must then turn to the balance of hardships and it is apparent to this Court, on the record before it, that the balance of hardships tips sharply in favor of plaintiffs. Plaintiffs are not operating a daily newspaper, while defendants are, and plaintiffs not able to provide the advertising penetration which defendants are through the operation of their daily newspapers. Plaintiffs must then rely upon advertisers in a biweekly newspaper in a limited market. This puts them at a competitive disadvantage which is severely compounded by the mailing to defendants' non-subscribers of a publication that is not substantially devoted to editorial and news content. There has been demonstrated, and the Court so finds, a threatened injury to the plaintiffs which would have a much more significant impact on their economic viability if an injunction did not issue than the adverse impact upon defendants in the event an injunction should issue. *See also Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir.1980). Injunctive relief is not new or novel with respect to antitrust relief involving competing newspapers. *See, e.g., Sun Newspapers, Inc. v. Omaha World Herald Company, et al.*, 713 F.2d 428 (8th Cir.1983).

Defendants urge that the issuance of an injunction herein will amount to a prior restraint on freedom of speech or expression, which violates the First Amendment of The United States Constitution. However, neither news gathering nor news or editorial dissemination is being regulated by this preliminary injunction. Indeed, it has been specifically held that the antitrust laws may be used by government to protect the guarantees of the First Amendment. *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945); *Citizen Publishing Co. v. U.S.*, *supra*, 394 U.S. at 139–40, 89 S.Ct. at 931–32, 22 L.Ed.2d at 156–57.

The defendants argue, persuasively, that there are new competitive forces in the marketplace and economic pressures from new quarters in the advertising print media as well as other aggressive competition for advertising dollars from other media, and thus a different climate exists than that which existed in 1968. This may well be so and it may be that a difference in kind, not degree, exists as to those forces and factors. However, absent constitutional dictates, this Court is not the forum for carving out exemptions to the clear congressional mandates of the Sherman and Clayton Acts. It may be in the public interest for Congress to broaden the Newspaper

Preservation Act to permit the conduct found here to be violative of the antitrust laws, but such relief cannot be afforded by this Court.

In accordance with the findings of fact and conclusions of law aforesaid,

IT IS ORDERED that pending completion of the trial and entry of the final judgment, defendants, all subsidiaries of any of the defendants, all subsequently acquired subsidiaries of any of the defendants, their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are prohibited from distributing that portion of the Arizona Daily Star and Tucson Citizen referred to as ROUNDUP and BULLETIN BOARD respectively, and the advertising material they provide the jacket for, to non-subscribers of either one of said papers by mail, delivery or otherwise within zip code 85614, being the community of Green Valley, Arizona, and further from distributing any slick paper, advertising circular, shopper or shopping newspaper or other advertising material by direct mail, home delivery, or otherwise.

IT IS FURTHER ORDERED that nothing herein shall prohibit the defendants from selling, delivering or mailing the Arizona Daily Star or Tucson Citizen, in their entirety, to subscribers or purchasers in the said zip code area, being the Green Valley community. Defendants shall not be restricted or enjoined from otherwise attempting to increase circulation and/or obtain advertisers in said community.

Because of the Court's finding that there is no actual proof of specific damage within a relevant market area and because of the allegations of Count Three which involve factual determinations concerning relevant markets, monopoly power, predatory pricing and other allegations contained in Counts One and Two and incorporated into Count Three (see paragraph 25, Plaintiff's Complaint), Partial Summary Judgment is inappropriate and the Motion for Partial Summary Judgment is denied.

## SUPPLEMENTAL ORDER

This matter is before the Court on re-briefing and reargument on plaintiffs' motion for partial summary judgment, defendants' motion for summary judgment, and on the plaintiff's motion for a permanent injunction or, in the alternative, for declaratory relief. Following argument, the Court took the matter under advisement, and it is now on for decision.

The plaintiffs' motion to amend to delete Paragraph One of Count Three is granted. The defendants' motion for summary judgment is denied. The parties are granted leave to renew the motions for partial or total summary judgment, or to seek other relief, following a reasonable time for discovery herein, such discovery deadlines to be set at the Court's status conference.

The original order of the Court herein, date September 5, 1984, shall remain in full force and effect except to the extent that this Supplemental Order modifies it.

In its original Order, the Court found that the publications ROUNDUP and BULLETIN BOARD were being distributed with a substantial amount of slick paper advertising inserts. These inserts contained *no* news or editorial information, but were merely contained within the four-page jacket which did contain news information and was printed on newsprint. The Court originally found that these papers were "shopping newspapers" as the same was defined in the Newspaper Preservation Act and in the legislative history attendant upon the enactment of the Newspaper Preservation Act. (See September 5, 1984 Order).

On the initial consideration of this matter the plaintiff filed, without objection, exhibits which the Court found showed that the primary or principal nature of the jacket and inserts was advertising, not news or editorial dissemination. The Court further found that the exhibits were representative of jackets and inserts being distributed in Green Valley. (See September 5, 1984 Order). After a preliminary injunction was

issued by this Court, defendants filed an Emergency Motion for Clarification of Order and Stay Pending Appeal, together with an affidavit in support thereof. Neither made any attempt to correct or contest the above factual findings.

The Court is now advised by counsel that, contrary to the above, the publication of ROUNDUP and BULLETIN BOARD is being distributed in Green Valley, almost uniformly, without any slick paper inserts.

■ Therefore, the prior finding of the Court that there was a contemporary violation of the antitrust laws (p. 14, September 5, 1984 Order) which was likely to recur is inaccurate as there has been no violation to date. Further, the Court now finds, for reasons and on the authority set forth in the September 5, 1984 Order, that ROUND-UP and BULLETIN BOARD, *as distributed in Green Valley*, are not "shopping newspapers."

It is significant that counsel for defendants admitted at the oral argument that, were the defendants able to obtain advertisers who wished to use the ROUNDUP and BULLETIN BOARD as a means of disseminating slick paper or other shopper advertisement material, they would readily do so. This, however, rather than amounting to a threat of injury, as opposed to a threat of distribution, seems to show that during the over some seven months of distribution, the defendants have been unable to make the publications ROUNDUP and BULLETIN BOARD attractive to advertisers. This may well be, as defendants suggest, because of the high circulation figures of the plaintiff Green Valley News. Thus the original Order must be amended because we are now faced with a "threat" of something which may never occur. And insofar as the jackets themselves are concerned, this Court has previously found, and reaffirms, that the same are newspaper publications within the meaning of 15 U.S.C. 1802(4).

The Court finds that the portion of ROUNDUP and BULLETIN BOARD printed on newsprint and referred to in both this and the Court's prior opinion as a "jacket" is a "newspaper publication" within the meaning of 15 U.S.C. § 1802(4), and is not a "shopping newspaper" in its present form. It is thus exempt from the antitrust laws.

The plaintiffs urge that these newspapers are, without question, "shoppers." That has been dealt with in the original order but the new factual material conclusively shows that what is being distributed in Green Valley is not a "shopper." It has the potential of becoming a shopper, and if it does, the plaintiffs are not precluded from returning to this Court for appropriate injunctive or other relief.

However, the Court finds that this may never happen, and in fact, all reasonable intendments from the evidence are that it will not happen. Thus, an injunction by this Court, or other finding attendant on summary judgment, is premature. The Court further notes that the injunction sought here would be most difficult to adjudge in that the format and content of BULLETIN BOARD and ROUNDUP could change, even if they were to include slick material advertising in the future. Thus, the Court would be faced with judging the primary or principal purpose of the distribution, as well as the content thereof, and this would necessarily involve considerations interpreting the First Amendment to the United States Constitution.

Because the original findings on page six of the Court's Order concerning the content of the BULLETIN BOARD and ROUNDUP were based upon the erroneous assumption that those publications were being distributed in Green Valley *with inserts,* those original findings are hereby amended consistent with this Supplemental Order. Accordingly, the plaintiffs' motion for permanent injunction and for partial summary judgment is denied.

The Court will, within two weeks, set a status conference at which time discovery deadlines will be discussed and set and the matter can proceed apace on all counts.