**In the Matter of D'LITES OF AMERICA, INC., Debtor.**

**Bankruptcy No. A86–05785–WHD.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Dec. 6, 1989.

Frank W. Scroggins, Scroggins & Brizendine, Atlanta, Ga., for Official Unsecured Creditors' Committee.

Michael D. Pinsky, Macey, Wilensky, Cohen, Wittner & Kessler, Atlanta, Ga., for Walton Investments, Inc.

## ORDER

W. HOMER DRAKE, Jr., Bankruptcy Judge.

This matter is before the Court on the objection of the Official Unsecured Creditors' Committee to the claim of Walton Investments, Inc. It is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(B) (1989). Having considered the testimony offered in the October 2, 1989 hearing on the matter, the supplemental briefs submitted by the parties, and the record in the case file, the objection is sustained and the claim is disallowed for the reasons set forth below. The following constitutes the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

Sometime before D'Lites of America, Inc. (hereinafter "D'Lites") filed its Chapter 11 petition, representatives of the financially troubled company approached Walton Investments, Inc. d/b/a The Levy Restaurant Corp. (hereinafter referred to as "Walton") to see if there would be interest in taking over the company. Walton was interested and made two loans of $250,000.00 to D'Lites to keep it afloat. Both loans were made at 12% interest, were secured and fully documented, and were approved by this Court. The entire amount of the loans was lost in operating deficits, and the loans were repaid from the sale of assets.

With an eye toward purchasing D'Lites, Walton also replaced D'Lites' terminated or otherwise departed employees in the operations, marketing, accounting and finance divisions with its own employees. In the currently disputed claim, Walton seeks reimbursement for approximately two-thirds of the "out-of-pocket" expenses incurred by these employees, including taxi fares, air fares, laundry bills, express mail expenses, phone bills, fuel bills, parking, lodging, meals, drinks and petty cash. The Creditors' Committee told Walton early in these proceedings that the Court must approve any payment for these expenses and that the Committee would oppose such payment. The Court never approved the incurring of the expenses. During the time that D'Lites remained in operation with Walton's participation, it sustained losses of around $700,000.00.

In an October 2, 1989 hearing, this Court heard testimony from John Mitchell, the former president and chief operating officer of D'Lites, and from Thomas Heymann, the president of Walton, to the effect that neither party anticipated the need to replace the personnel before the petition was filed, and that Mitchell made this request post-petition in order to keep D'Lites in operation to preserve estate assets. Mitchell and Heymann also testified that Mitchell agreed to reimburse Walton for its reasonable expenses in replacing the departed employees. Apparently this information was not shared with D'Lites' attorney or with the attorney for the Creditors' Committee until just before the hearing. Additionally, while other administrative claimants were paid, Walton's periodic demands for payment of expenses as they were incurred were refused by D'Lites.

The Court ultimately approved the sale of certain D'Lites stores, proceeds of which form the basis of the corpus to be distributed to creditors. In support of its administrative claim, Walton argues that this sale was made possible by the replacement of D'Lites' in-house employees, and that the value of the stores depended on keeping them open. In opposition, the Unsecured Creditors' Committee contends that the expenses were incurred solely for Walton's benefit and not for the benefit of D'Lites or the estate; that the expenses were unnecessary; that the estate would have been better off if D'Lites had sold the assets immediately rather than continuing to operate; and that Walton never sought this Court's authorization to incur the expenses.

### CONCLUSIONS OF LAW

As the Creditors' Committee points out, the issue of whether Walton's claim for post petition expenses is entitled to an administrative priority must be preceded by a preliminary question: was Walton entitled to incur these expenses without court approval? The answer depends on the nature of the expenses. Section 327(a) of the

Bankruptcy Code requires the Court's approval for the employment of "professional persons ... to represent or assist the trustee in carrying out the trustee's duties under this title," 11 U.S.C. § 327(a) (1989). In the context of this provision, a "professional person" is one who takes a central role in the administration of the bankruptcy estate and in the bankruptcy proceedings, as opposed to one who provides services to the debtor that are necessary whether the petition was filed or not, *In re Century Investment Fund VII Limited Partnership*, 96 B.R. 884, 893–94 (Bankr.E.D.Wisc.1989); *In re Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr.S.D.N.Y.1981). Thus, in *Century Investment Fund*, a property manager who rented apartments and arranged for maintenance was not a "professional person" under § 327(a) because he did not play a role in the bankruptcy proceedings, and court approval of his employment was not necessary, 96 B.R. at 894. Similarly, in *Seatrain Lines*, maritime engineers sought to be retained by the debtor as consultants were members of a profession but were not "professional persons" for bankruptcy purposes, 13 B.R. at 981.

In contrast, § 363(c)(1) allows a debtor-in-possession to use estate property in the ordinary course of business without a prior hearing, 11 U.S.C. § 363(c)(1) (1989), so that the debtor-in-possession can exercise reasonable judgment in carrying out its everyday affairs and can avoid excessive judicial involvement in its reorganization. "[T]he 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run a business and respond quickly to changes in the business climate," *In re Johns–Manville Corp.*, 60 B.R. 612, 617 (Bankr.S.D.N.Y.1986). To meet this standard, according to the Bankruptcy Court in *Johns–Manville*, the transaction in question need not be common, but must only be ordinary, and one must look both at industry-wide practices and at the prior practices of the company itself to make this determination, 60 B.R. at 616–18. Using this analysis, the Seventh Circuit Court of Appeals found that the replacement of a debtor's regularly employed personnel by a claimant's personnel was in the ordinary course of business, and that action did not require prior court approval, *Park Terrace Townhouses v. Wilds*, 852 F.2d 1019, 1022 (7th Cir.1988).

Similarly, this Court finds that Walton's employees who replaced D'Lites' departed personnel in the operations, finance, marketing and accounting divisions were not "professional persons" under § 327(a), and that the replacement was in the "ordinary course" of D'Lites' business under § 363(c)(1). While some of the employees may have been members of a professional community, they were not hired to assist D'Lites in handling the bankruptcy proceeding. Instead, their function was to try to keep the ailing company in operation by performing everyday functions in the ordinary course of business. Accordingly, their employment was not subject to the Court's approval.

The same "hands-off" treatment of transactions in the ordinary course of business may not be applied to the allowance of administrative expenses. Because bankruptcy law demands equality of distribution absent a compelling justification for a different result, and because administrative expenses are given priority status by § 507(a)(1) and therefore deplete the funds available to general unsecured creditors, *In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr.S.D.Cal.1988), *In re Amfesco Industries, Inc.*, 81 B.R. 777, 780 (Bankr.E.D.N.Y.1988), administrative expense claims must be given strict scrutiny, *In re Patch Graphics*, 58 B.R. 743, 745 (Bankr.W.D.Wisc.1986). Thus, under § 503(b)(1)(A), which includes as allowed administrative expenses "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case," 11 U.S.C. § 503(b)(1)(A) (1989), the terms "actual and necessary" are construed narrowly, and Walton has the burden of proving that the expenses were necessary to preserve the estate, *Patch Graphics*, 58 B.R. at 745. Similarly, under § 503(b)(3)(D), which also includes as administrative expenses "the

actual, necessary expenses ... incurred by ... a creditor ... in making a substantial contribution in a case under chapter 9 or 11 of this title," 11 U.S.C. § 503(b)(3)(D) (1989), Walton must prove that the expenses resulted in a significant and tangible benefit to the estate, *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988); *D.W.G.K. Restaurants*, 84 B.R. at 689; *Patch Graphics*, 58 B.R. at 745. Walton seeks payment under both of these provisions.

The Seventh Circuit Court of Appeals faced a similar set of facts when it decided to give administrative priority status to the claimant's expenses in *Park Terrace Townhouses v. Wilds*, 852 F.2d at 1019. In that case, the claimant took possession of debtor's property and performed services as property manager and maintenance supervisor pursuant to an agreement under which he would eventually purchase the property. The claimant removed the debtor's resident manager and hired a staff to perform his activities; he maintained, upgraded and remodeled the rental units; and he instituted a marketing program which significantly increased occupancy rates and monthly income. The Bankruptcy Court awarded $21,750.00 to the claimant as an administrative expense, representing 870 hours of work at $25.00 per hour, and the District and Circuit Courts affirmed the award on appeal. *Id.*

■ There are two distinctions between that case and the one presently at bar which lead this Court to a different conclusion. First, in this case Walton is not asking for compensation in the nature of wages for services performed, unlike the claimant in *Park Terrace Townhouses*. Instead, it wants reimbursement for the "out-of-pocket" expenses of its employees, such as taxi and airplane fares, dining and entertainment tabs, and hotel charges. While the language of § 503(b)(1)(A) clearly contemplates the reimbursement of wages and salary as an administrative expense, the statute does not address the treatment of these miscellaneous expenses. Such expenses have been found "necessary" for a claimant who has acted outside of his ordinary course of business and who has made

an extraordinary sacrifice to preserve the bankruptcy estate, *see In re Saroca Corp.*, 46 B.R. 533 (Bankr.D.Me.1985) (debtor's sole shareholder who spent two years traveling to find financing for the company, who dealt with 40–50 entities, and who had no office and no phone was allowed phone bills and travel expenses as administrative expenses), but those circumstances are not present here. The employees in this case were enlisted to perform their usual duties, and their effort is reflected in the payment of their regular salaries. Some of the employees understandably needed transportation from out of town and lodging for the duration of their employment; given the immediate and temporary nature of their assignment, these expenses appear to be "actual and necessary" to sustain their employment. The other expenses, however, are those of everyday living, and Walton's request that the estate absorb them is not necessary and is, in fact, excessive.

■ The second distinction is that the claimant in *Park Terrace Townhouses* provided a significant and tangible benefit to the estate by maintaining, upgrading and remodeling the debtor's rental units, and by increasing occupancy rates and monthly income, while Walton's participation in the present case resulted in no concrete benefit to the estate. To the contrary, D'Lites sustained approximately $700,000.00 in losses during its operating effort with Walton. Walton insists that the continued operation of the business increased the value of D'Lites assets at the time of sale, but it does not quantify the benefit to the estate. This Court is simply not convinced that D'Lites needed to suffer through these extensive operating losses in order to make its assets somewhat more attractive to potential purchasers. While the travel and lodging expenses may have been necessary to sustain the employment of Walton's personnel, Walton's involvement as a whole was detrimental to the estate rather than "necessary" for its preservation, for the purposes of § 503(b)(1)(A), and caused an adverse impact on the estate rather than a "substantial contribution" as required by § 503(b)(3)(D).

The fact that Walton's employees continued to operate the business in the face of such a significant loss leads this Court to conclude further that Walton was acting in its own best interest, rather than in the best interest of the estate. When a creditor incurs expenses primarily to protect its own interests rather than the interests of the estate, the creditor is not entitled to a priority claim, *Lister*, 846 F.2d at 57; *Patch Graphics*, 58 B.R. at 746; *In re McK, Ltd.*, 14 B.R. 518, 520 (Bankr.D.Colo. 1981). Walton was motivated not by the desire to keep the estate going but by the possibility that it would buy out D'Lites' business. In these circumstances, the Court can not allow compensation for Walton's expenses from the estate as an administrative priority.

Accordingly, it is ORDERED that the objection to the claim of Walton Investments, Inc. is hereby SUSTAINED and the claim for administrative priority is DENIED.

IT IS SO ORDERED.