### In re COMMUNICATIONS MANAGEMENT & INFORMATION, INC., Debtor.

Bankruptcy No. 92–61432.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Jan. 11, 1994.

138

Kyle Woods, Atlanta, GA, for TelAmerica.

John Pennington, Wilson, Strickland & Benson, Atlanta, GA, for chapter 7 trustee.

## ORDER

MARGARET H. MURPHY, Bankruptcy Judge.

This matter is before the court on the Third Amended Application of TelAmerica Corporation for Allowance and Payment of Administrative Claim for Services Rendered and Reimbursement of Expenses (the "Third Application") filed June 15, 1993 pursuant to 11 U.S.C. § 503(b)(1), 503(b)(3)(D) and 503(b)(4). The Third Application seeks compensation and reimbursement of expenses in the following amounts:

| For services provided by TelAmerica employees: [1] | | |
|---|---|---|
| T. Larry Amick | 163.3 hours @$110/hour | $17,963.00 |
| John C. Wilson | 256.2 hours @$85/hour | 21,777.00 |
| M.N. Rosenmarkle | 75.3 hours @$75/hour | 5,647.50 |
| Ira A. Hunt, Jr. | 46.6 hours @$95/hour | 4,427.00 |
| Gerald L. Hornick | 53.6 hours @$75/hour | 4,020.00 |
| George Adams | 117.0 hours @$55/hour | 6,435.00 |
| For reimbursement of expenses of those five employees: | | |
| Including airfares, lodging, meals and ground transportation | | 14,230.54 |
| For services of J.H. Marketing | | 27,202.59 |
| For services of Stone Mountain Systems | | 26,800.00 |
| For services of Stonebridge Management Services [2] | | 4,950.00 |
| TOTAL | | $124,419.08 |

On November 22, 1993, the Chapter 7 Trustee filed a motion for summary judgment denying the Third Application. TelAmerica Corporation ("TelAmerica") filed a response opposing the Trustee's motion. The Chapter 7 Trustee filed a reply. In addition to the pleadings filed in connection with the motion for summary judgment, the Third Application and the exhibits which accompanied it were considered.

### STATEMENT OF FACTS

Debtor was in the telecommunications business concentrating in providing 900 calling services. An involuntary petition was filed against Communications Management &

---

1. The hourly rates which TelAmerica seeks as compensation for its employees' services are based on the cost to TelAmerica in salaries. Therefore based upon a 40–hour/week, 52 week/year calculation, Mr. Amick's annual salary is $228,800, Mr. Hunt's is $197,600, Mr. Wilson's is $170,000, and annual salaries for both Messrs. Rosenmarkle and Hornick are $156,000.

2. Stonebridge provided accounting services for TelAmerica. The principal of Stonebridge and the individual who provided services to TelAmerica is now employed in this case by the Trustee as her expert concerning the value of Debtor.

Information, Inc. ("Debtor") January 24, 1992. A Chapter 11 Trustee was appointed February 14, 1992 and the order for relief was entered March 5, 1993. TelAmerica was interested in acquiring Debtor prepetition and was engaged in negotiations with Debtor for its acquisition prior to the filing of the bankruptcy petition. TelAmerica extended credit to Debtor postpetition but before the entry of the order for relief to allow Debtor to meet its payroll and other operating expenses. After the order for relief was entered, and with court authority, TelAmerica continued to extend credit to Debtor to fund payroll and operating expenses.

TelAmerica continued to pursue acquisition of Debtor postpetition and chose to do so via its plan of reorganization instead of a purchase from the Trustee. During the time that TelAmerica was formulating its plan and disclosure statement, TelAmerica consulted with Trustee and either or both of the petitioning creditors and the creditors' committee. TelAmerica filed a plan and disclosure statement as "Purchaser/Reorganizer" June 4, 1992.[3] The case was converted, however, on the motion of the Chapter 11 Trustee to a Chapter 7 case by order entered September 3, 1992.

After the § 341 meeting held in July, 1992, Trustee removed Les Gable as Debtor's CEO and briefly replaced him with George Adams, an employee of TelAmerica. Two weeks later, Adams' services were terminated by Trustee when she decided to file her motion to convert. During the two week period Adams served as CEO of Debtor, Adams was paid by TelAmerica.

Between the filing of the January involuntary petition and Trustee's motion to convert, TelAmerica became involved in attempting to salvage and revive Debtor's operations, which had largely ceased when the petition was filed. TelAmerica's activities are detailed in the Third Application and are discussed below. TelAmerica contends it provided general management, marketing, financial management, collections and systems and data processing services to Debtor during this period. TelAmerica asserts that

those services represent a substantial contribution to the case or were actual and necessary for the preservation of the estate.

After Trustee filed her motion to convert, she contacted TelAmerica to ask whether TelAmerica wished to purchase Debtor. At that time, Trustee had "locked down" Debtor. Approximately a week later, however, TelAmerica and Trustee executed a purchase agreement and Trustee allowed TelAmerica to resume operating Debtor's business. The purchase was closed September 22, 1992, shortly after the case was converted.

The purchase agreement between Trustee and TelAmerica, executed August 7, 1992, provided for acquisition by TelAmerica of the lease of Debtor's business premises; all Debtor's hard assets, including furniture, computers, telecommunications equipment; Debtor's intangibles, including software license rights, copyrights, etc.; Debtor's Georgia Dome Executive Suite License Agreement; and Debtor's accounts receivable. The agreement also provided for acquisition by TelAmerica of an interest in Debtor's claim against MCI and acceptance of the obligation to fund the litigation against MCI. The purchase price was $500,000 cash less $152,232.95 for the postpetition loans extended by TelAmerica to Debtor, less $30,000 payment to cure defaults on the Georgia Dome license, less $8,951.86 owed by the Trustee for accounts receivable not paid to TelAmerica as provided in the purchase agreement.

TelAmerica filed an application January 7, 1993, for payment of administrative expense for services rendered to the Debtor from January, 1992 through August, 1992 in the total amount of $138,942.63. Objections were filed to the application by the Chapter 7 Trustee, the U.S. Trustee, MCI Telecommunications Corporation ("MCI") and the petitioning creditors. Two amendments and supplements to the application were filed by TelAmerica February 8, 1993 and May 10, 1993.

Hearing was held May 10, 1993 on the amended and supplemented application. The

---

**3.** The petitioning creditors joined as proponents of the plan. The Trustee declined to be joined as a proponent but filed no objections to the plan or disclosure statement.

court requested a third amendment to the application of TelAmerica, a detailed response thereto from the Chapter 7 Trustee, and established a briefing schedule on the issues presented. Trustee's motion for summary judgment was filed after the Third Application, Trustee's response and the briefs were filed.

The Third Application contains itemized lists of expenses and time summaries of the time expended by T. Larry Amick, John C. Wilson, Michael N. Rosenmarkle, Ira A. Hunt, Jr., and Gerald L. Hornick, all of whom were at all relevant times employees of TelAmerica. Also included is information on the services provided by J.H. Marketing, a firm employed by TelAmerica who performed services for Debtor; by Stone Mountain Systems and Development Corporation (the Trustee does not dispute that Stone Mountain is entitled to payment as an administrative expense); and by Stonebridge Management Strategies, an accounting firm employed by TelAmerica.

In the Third Application, TelAmerica classified each of the time entries of its employees as in one of four categories: Category A, Priority lender to Debtor; Category B, Management and administrative provider to Debtor; Category C, Proposer and organizer of the Plan for Debtor; and Category D, Purchaser of Debtor's asserts. Examples of entries designated as Category B include: "Review work of [accountant] on asset values," "Discuss with Rosenmarkle [Debtor's] cash needs/timing/alternatives." "Wire funds to [Debtor] for lease payment," "Review of accounts payable, budgets and forecasts," "Review proposal for support/acquisition of [Debtor]." Another example is Mr. Amick's time entry for May 14, 1992, which shows the following:

> Work to prepare for court/creditor sessions; team with Wilson and with [Debtor's] staff on comprehensive financial report, respond to Stonebridge Management requests.

In Category B time entries for March, 1992, several discussions took place with Mr. Berglund (Debtor's current CEO) regarding a pay cut which the Trustee intended to implement which would reduce Mr. Berglund's salary by half. TelAmerica's employees had volunteered to discuss the matter with Mr. Berglund because TelAmerica wished to retain Mr. Berglund's services for its own benefit after its acquisition of Debtor. Other examples of Category B time entries include "Seek ATC business in Atlanta," "Collection of [Debtor's] accounts receivable," "Work with [Debtor's CEO] and staff on general management and accounting matters," "Work with [Debtor's CEO] and staff on reduction of operating expenses, [Debtor's] cash needs, receivables and general management and marketing matters."

TelAmerica's Third Application also includes services performed by TelAmerica's employees and J.H. Marketing which involved the collection of accounts receivable and the identification and recovery of estate assets. Although Trustee may not have specifically requested such services from TelAmerica, she knew of TelAmerica's involvement with Debtor, acquiesced to those activities, and accepted the benefit therefrom to the estate. Trustee now asserts that TelAmerica's activities resulted in no net gain for the estate and were, in fact, detrimental to the estate.

## DISCUSSION

Pursuant to FRCP 56(c), incorporated in Bankruptcy Rule 7056, a party moving for summary judgment is entitled to prevail if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. The burden of proof is on the moving party to establish that a genuine issue of material fact is absent. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991).

Only disputes of fact which might affect the outcome of the proceeding will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also, Lyons v. U.S. Marshals,* 840 F.2d 202 (3d Cir.1988); *Donovan v. General Motors,* 762 F.2d 701 (8th Cir.1985). "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the

substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202. The actual quantum and quality of proof necessary to support a finding in favor of the plaintiff must be considered to determine whether a *genuine* dispute of fact exists. *Id.* Where the judge is also the ultimate trier of fact, and where a trial would not enhance the court's ability to draw inferences and conclusions from undisputed facts, then the court is free to draw such inferences and conclusions within the context of a motion for summary judgment. *Wick v. Tucson Newspaper, Inc.*, 598 F.Supp. 1155 (D.Ariz.1985); *Nunez v. Superior Oil Co.*, 572 F.2d 1119 (5th Cir. 1978).[4]

■ To ensure that the basic priorities among creditors and the goal of equality of distribution are not disrupted, claims for administrative expense pursuant to § 503(b) are subject to strict scrutiny. *In re D'Lites of America, Inc.*, 108 B.R. 352, 355 (Bankr. N.D.Ga.1989); *In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr.S.D.Cal.1988); *In re Patch Graphics, Inc.*, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986). The burden of proof as to "substantial contribution" to the case under § 503(b)(3)(D) and (4) or "actual and necessary expenses for preserving the estate" under § 503(b)(1)(A) is on the party making the claim for the administrative expense. *In re FRG, Inc.*, 124 B.R. at 658; *In re D.W.G.K. Restaurants, Inc.*, 84 B.R. at 689; *In re 1 Potato 2, Inc.*, 71 B.R. 615, 618 (Bankr.D.Minn.1987); *In re D'Lites of America, Inc.*, 108 B.R. at 355; *In re Patch Graphics, Inc.*, 58 B.R. at 745.

■ In Trustee's motion for summary judgment, relying upon *D'Lites of America,* Trustee appears to argue that if the value of the estate was not enhanced—as opposed to remaining the same or decreasing—during the period of time that TelAmerica provided services to Debtor, then TelAmerica is entitled to no compensation. The standards for compensation under § 503(b), however, cannot be reduced to little more than a valuation question and *D'Lites of America* does not stand for that principle.

■ TelAmerica's argument that denial of § 503(b) compensation can only be based upon a finding that services were performed *solely* for the benefit of the creditor is without merit. Very few "bright line" rules exist in bankruptcy law. As courts of equity, bankruptcy courts are not only empowered but compelled to consider all relevant facts and circumstances and employ equitable principles to reach a just result which comports with the goals and policies of the Bankruptcy Code. The Third Application will be evaluated in this manner.

### A. *The § 503(b)(3)(D) and (4) Claim*

■ The first consideration is whether TelAmerica provided services which made a "substantial contribution" to the case, as § 503(b)(3)(D) and (4) limit the allowance of administrative expense claims to services which make a substantial contribution. "Substantial contribution" is not defined by the Bankruptcy Code. Courts interpreting § 503(b)(3)(D) have defined substantial contribution as services which foster and enhance, rather than retard or interrupt the progress of reorganization, *In re Richton International Corp.*, 15 B.R. 854, 857 (Bankr. S.D.N.Y.1981); which conferred a significant and demonstrable benefit to the debtor's estate and to the creditors, *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir.1986); which resulted in a significant and tangible benefit to the estate, *Matter of D'Lites of America, Inc.*, 108 B.R. at 356; had a direct, significant, and demonstrable positive effect upon the estate, *In re Lease-A-Fleet, Inc.*, 148 B.R. 419, 426 (Bankr. E.D.Pa.1992), *citing, In re FRG, Inc.,* 124 B.R. 653, 658 (Bankr.E.D.Pa.1991); and, resulted in tangible benefits which were considerable in amount, value or worth, *In re 1 Potato 2, Inc.*, 71 B.R. at 618.

TelAmerica asserts that it made substantial contributions in a number of areas including general management and support services, marketing and sales management services, financial management, systems and data processing services and plan formula-

---

4. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), renders decisions of the Fifth Circuit issued prior to September 30, 1981, binding precedent for the Eleventh Circuit.

tion. TelAmerica insists that its efforts were to preserve Debtor as a going concern and maintain its assets, thereby making the company more attractive for potential purchasers.

This argument is not unlike the argument made in *Matter of D'Lites of America, Inc.,* wherein a creditor of the debtor argued its activity in the case resulted in increased value of the business at the time of sale. Judge Drake held that the debtor need not have suffered "through these extensive operating losses in order to make its assets somewhat more attractive to potential purchasers." *Matter of D'Lites of America, Inc.,* 108 B.R. at 356.

In the instant case, the focus for determining whether TelAmerica's activities constitute a substantial contribution to the case is the purpose behind TelAmerica's activities. The evidence presented in the case at bar shows that Debtor was essentially not operating at the time the petition was filed. Debtor was later "locked down" by Trustee July 31, 1992, when she decided to convert the case to Chapter 7, but shortly thereafter, Trustee allowed TelAmerica to operate Debtor pending consummation of the purchase agreement. TelAmerica provided post-petition financing and other assistance to Debtor to keep it afloat and operating, and then purchased the assets of Debtor from Trustee after Trustee decided Debtor could not be reorganized.

The parties dispute whether Debtor's value was enhanced as a result of TelAmerica's involvement. TelAmerica argues that, but for its activities, Trustee would have been able to sell Debtor only as a defunct business whose liquidation value would have been far less than it was when sold as a going concern. At best, however, TelAmerica could show only that Debtor's value as a going concern was maintained but not significantly enhanced.[5]

Trustee argues, however, that TelAmerica's postpetition operations of Debtor consumed financial assets which would have otherwise been available to unsecured creditors.

Trustee, however, was willing to accord wide latitude to TelAmerica in respect to management of Debtor both before and after she decided to convert the case because she anticipated the ultimate acquisition of Debtor by TelAmerica. Trustee has made no allegation that TelAmerica managed Debtor poorly or intentionally depleted Debtor resources. TelAmerica's purpose was to keep Debtor operating and perhaps expand those operations to revive and reorganize Debtor into a profitable enterprise and thereby render Debtor a more valuable acquisition for TelAmerica.

Although Debtor was operating postpetition at a substantially reduced level, it was operating and TelAmerica was scrambling to obtain new business. The undisputed facts show that Debtor was more valuable to TelAmerica even at its reduced operating level than it would have been as merely a collection of hard assets. TelAmerica "propped-up" Debtor long enough for TelAmerica to work out the details for its acquisition of Debtor. Contrary to TelAmerica's characterization of the services provided to Debtor by its employees, a review of the actual time entries in the Third Application show a great number of the entries designated as Category B were not management and administrative services provided to Debtor but instead were services provided to TelAmerica in connection with one of the other three categories. The benefit of TelAmerica's employees' activities acceded to TelAmerica; no real benefit was conferred upon the estate or the creditors in general. Therefore, although TelAmerica provided various services to Debtor and was the eventual purchaser of Debtor, it did not make a substantial contribution to the case.

■ With respect to the Category A time expended in negotiating the post-petition financing, TelAmerica is entitled to no compensation or expense reimbursement. TelAmerica was adequately compensated by virtue of the interest charged Debtor for the loans. Any time expended thereon or ex-

---

**5.** TelAmerica asserts that Trustee's "premature" conversion to Chapter 7 occurred at the point at which Debtor was turning the corner toward profitability. This court will not second guess Trustee's judgment and will not speculate regarding events which did not occur.

pense incurred in traveling to Atlanta, or communicating with parties in Atlanta via telephone, facsimile or the mails is an expense of doing business as a postpetition lender, and should be borne by TelAmerica.

■ Likewise, the services allocated to Category C as plan proponent and Category D as purchaser were in TelAmerica's own self-interest in conjunction with an investment prospect. TelAmerica had an eye on acquiring Debtor from the inception of the case. If Debtor were not in bankruptcy, the cost of TelAmerica's activities would have been borne by TelAmerica as a part of its due diligence and negotiations for the purchase of the assets. *In re Frog and Peach, Ltd.,* 38 B.R. 307, 309 (Bankr.N.D.Ga.1984). TelAmerica must, therefore, wait for a return on its investment like any other investor. It cannot look to this estate for reimbursement of expenses it would normally bear in the first instance.

■ With respect to TelAmerica's claim pursuant to § 503(b)(4), the court finds this provision inapplicable to the facts of this case and the compensation and expenses for which TelAmerica makes application. Section 503(b)(4) deals with professional compensation for an attorney or accountant who might be entitled to reimbursement of expenses under § 503(b)(3) and places a higher standard of "reasonableness" on the requested compensation. The compensation requested by TelAmerica is neither for attorney nor accountant services.

B. *The § 503(b)(1) Claim*

■ The alternative provision under which TelAmerica makes application for administrative expense claim is § 503(b)(1). Under this subsection, TelAmerica has the burden to show that its expenditures were actual and necessary for the preservation of the estate. The terms "actual and necessary" are construed narrowly. *Matter of D'Lites of America, Inc.,* 108 B.R. at 355.

■ It is evident from the time entries that the efforts of TelAmerica's employees for which it seeks compensation and the expenses for which it seeks reimbursement were for TelAmerica's benefit as the ultimate purchaser of the assets. Any benefit to the estate was incidental and insignificant. Without doubt, TelAmerica's actions were not as altruistic as TelAmerica characterizes them. The activities of TelAmerica's employees were either an information-gathering/due-diligence function or were designed to keep Debtor operating so that TelAmerica could acquire Debtor as a going concern instead of as a collection of assets of a defunct business. The nature of Debtor's—and TelAmerica's—business is such that even a brief interruption of service inflicts substantial harm upon both short and long-term revenues. Continuity of service is the linchpin of a business like Debtor's. A purchaser of estate assets will not be compensated for its time and effort in accomplishing the purchase of the assets. The time expended as plan proponent is likewise non-compensable because it was expended for the primary purpose of acquiring Debtor.

The services of only one employee of TelAmerica are compensable by the estate. George Adams was installed briefly as CEO of Debtor by Trustee. Trustee attempts to argue that Mr. Adams failed to adequately perform during his brief tenure as CEO. The decision to install Mr. Adams, however, was apparently based upon a conclusion that the prior CEO, who was employed and paid as an employee of Debtor, was not performing adequately. Mr. Adams was employed with Trustee's consent and at her direction and was paid by TelAmerica with the Trustee's knowledge and acquiescence. Thus, his services are compensable in the amount of $6,435.00

■ Trustee does not dispute that TelAmerica should be reimbursed for the services of Stone Mountain Systems in the amount of $26,800. The services of J.H. Marketing also appear to be compensable by the estate. Although J.H. Marketing provided some marketing services which ultimately inured to the benefit of TelAmerica, J.H. Marketing provided a significant benefit to the estate by collecting Debtor's accounts receivable, billing current and new customers of Debtor, and identifying and assisting in the recovery of assets of Debtor. J.H. Marketing is not associated with TelAmerica and was em-

ployed by TelAmerica to perform services for Debtor. Many of the services which J.H. Marketing performed were duties of the Trustee and were performed, if not at her request, with her knowledge and acquiescence. Those activities constitute actual and necessary expenses for preservation of the estate and are compensable under § 503(b) in the amount of $27,202.59.

■ The accounting services performed by Stonebridge Management Strategies, on the other hand, were services performed for TelAmerica to assist it in its intended acquisition of Debtor. As discussed above, such activities are not compensable by the estate.

■ The final argument made by Trustee is that the claim of TelAmerica for an administrative expense should not be allowed inasmuch as it gave no notice of its intention to file such a claim against the estate. The cases which the Trustee cites in support of her position relate to a requirement that a proponent of a plan of reorganization must disclose in the disclosure statement whether the proponent intends to apply for an administrative expense priority. As this case, which was an aborted Chapter 11 case, did not progress to the point of approval of the disclosure statement, those cases are inapposite.

Logically, if during the negotiations for the sale of Debtor, Trustee lacked any notion that TelAmerica would request payment of administrative expense, TelAmerica's failure to disclose such intent would have the effect of allowing TelAmerica to "double dip," i.e. receive the benefit of the services by acquiring Debtor and also by receiving payment for the services from the estate. If Trustee did not know of the intent to seek administrative expense, she could not concomitantly adjust the purchase price.

Trustee, however, knew the nature and extent of the services which had been performed by TelAmerica. She had ample reason to suspect TelAmerica would file an application for administrative expense. As a part of her negotiations for the sale of Debt-

or, she could have asked TelAmerica about its intentions. Additionally, TelAmerica presented evidence that it did inform Trustee, in an August 3, 1992, letter to Trustee, of its intention to apply for administrative expense.[6] TelAmerica's disclosure of its intent to apply for administrative expense was adequate. Accordingly, it is hereby

ORDERED that the Third Application is allowed in the following amounts:

| | |
|---|---|
| Compensation of George Adams | $ 6,435.00 |
| J.H. Marketing | 27,202.59 |
| Stone Mountain Systems | 26,800.00 |
| **TOTAL** | **$60,437.59** |

The remainder of the Third Application is DENIED.

IT IS SO ORDERED.

6. Trustee has objected to consideration of the August 3, 1992 letter. The letter, however, is not hearsay, as it is not offered for the proof of the matter asserted. Larry Amick, TelAmerica's CEO, has sworn to its authenticity. The letter, therefore is admissible.